**Dee Deidre FARMER, Plaintiff,**

v.

**Kathleen M. HAWK–SAWYER, et al., Defendants.**

**Civil Action No. 92–1690(GK).**

United States District Court, District of Columbia.

Sept. 28, 1999.

James J. Sandman, Laura K. McNally, Arnold & Porter, Washington, DC, Jeffrey Francis Orchard, Washington, DC, for plaintiff.

Dee Farmer, Butner, NC, pro se.

Stacy M. Ludwig, Assistant U.S. Attorney, U.S. Attorney's Office, Washington, DC, James Robert Layton, U.S. Attorney's Office, Jefferson City, MO, for defendants.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiff Dee Deidre Farmer is an inmate at the federal correctional institute in Butner, North Carolina ("FCI–Butner"). Farmer is a pre-operative male-to-female transsexual suffering from gender dysphoria (or gender identity disorder), a medi-

cally recognized psychological disorder.[1] She brings this action to challenge the constitutionality of a Bureau of Prisons ("BOP") policy regarding the medical treatment of transsexuals.

This matter is now before the Court on Defendants' Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment [# 111]. Having considered Defendants' Motion, Plaintiff's Opposition, Defendants' Reply, and the entire record herein, for the reasons set out below, Defendants' Motion is hereby **granted.**

## I. Background[2]

Plaintiff is a transsexual suffering from AIDS who has been incarcerated in the federal prison system since 1986. She claims that the BOP has failed to treat her transsexualism. The underlying facts in this action are explained in greater detail in this Court's Memorandum Opinion of January 22, 1998. This Memorandum Opinion focuses on the narrower issue of whether the BOP's policy regarding the treatment of transsexual prisoners violates the Equal Protection Clause of the Fifth Amendment to the U.S. Constitution.

In response to this Court's Memorandum Opinion of January 22, 1998, both parties submitted declarations of experts in the field of gender identity disorders. Defendants' expert is Dr. Gregory K. Lehne, Ph.D., a licensed psychologist in Maryland and Associate Professor of Medical Psychology at the Johns Hopkins University School of Medicine. Decl. of Lehne at 1. He has evaluated and/or treated more than 50 individuals with gender identity disorders, and has written several professional publications on this topic. Second Decl. of Lehne at 1.

Plaintiff's expert is Dr. George R. Brown, M.D., a board-certified psychiatrist, who is Professor of Psychiatry and Chairman of the Department of Psychiatry at East Tennessee State University. Decl. of Brown at 1. He has written extensively on the topic of gender identity disorder, and has evaluated and/or treated approximately 300 patients with gender identity disorder; he has also evaluated or interviewed approximately 500 additional individuals who are transgendered. *Id.* at 2. Dr. Brown is a member of the only international organization that addresses the evaluation and treatment of individuals with gender identity disorders, the Harry Benjamin International Gender Dysphoria Association. *Id.* at 1.

The following facts about gender identity disorder are adopted from the declarations of these two experts, as well as the Standards of Care established by the Harry Benjamin International Gender Dysphoria Association ("Benjamin Standards").[3] Only undisputed facts are presented, unless otherwise noted.

---

1. *See, e.g.,* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 532–33 (4th ed.1994). ("DSM–IV") Transsexualism is a condition that exists when a physiologically normal person is extremely uncomfortable and discontent with his or her particular sex and prefers to be the other sex. Usually, transsexuals wish to utilize hormonal, surgical, and civil court procedures to allow them to live in their preferred sex role. *Id.* They are distinguishable from transvestites (who are generally male heterosexuals who cross-dress for sexual arousal rather than sexual comfort), *id.* at 530–31, and homosexuals (who are sexually attracted to persons of the same sex). *Webster's Third New International Dictionary,* 1085 (1993). Farmer is a biological male but considers and conducts herself as a female. All parties to this action refer to Farmer using the female pronoun and the Court will do the same.

2. Pursuant to Local Rule 108(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." For reasons discussed below, the Court will consider Defendants' Motion, not as a Motion to Dismiss, but as a Motion for Summary Judgment. Accordingly, unless otherwise noted, the Court takes its facts from Defendants' Statement of Material Facts As to Which There Is No Genuine Issue. Unless otherwise stated, the Court states only uncontroverted facts.

3. These standards, which are clinical guidelines, were created by the Harry Benjamin International Gender Dysphoria Association as minimum requirements for the treatment

Gender identity disorder is most simply described as an individual's confusion or discomfort about his or her sexual status as a biological male or female. Diagnosis of gender identity disorder is difficult and takes time, because it requires differentiating between individuals who are homosexual or transvestite, and those who are truly suffering from gender identity disorder. A further complication concern is the fact that, because at its core gender identity disorder involves confusion about one's status as a member of a particular sex, such confusion can lead to spontaneous changes in desires. Additionally, it is not uncommon for individuals with gender identity disorder to become depressed, have suicidal ideation, or attempt autocastration. All these factors make diagnosing and treating individuals with gender identity disorder difficult and time-consuming. For the same reasons, an individual's self-reporting of their desires is only one consideration among many when choosing among treatment options.

The basic approach to the treatment of individuals with gender identity disorder is outlined in the Benjamin Standards. Under the Benjamin Standards, mental health professionals play a critical role in treatment; they perform the necessary functions of diagnosing an individual's gender disorder, counseling the individual about his or her treatment options, providing psychotherapy, determining the individual's eligibility and readiness for hormonal or surgical therapy, and taking all necessary steps, including follow-up care, should the individual elect to go forward with hormonal or surgical therapy. Benja-

min Standards, Part Three, Section III (1998).

The mental health professional has many treatment options for individuals with gender identity disorder. One approach is psychotherapy. Although it is not a requirement for further treatment, psychotherapy plays an important role in helping an individual with gender identity disorder develop realistic expectations about his or her work and relationships, create a long-term stable lifestyle, find a comfortable way to live with his or her disorder, and prepare him or her for further treatment. Benjamin Standards, Part Three, Section VI (1998). Another treatment option is called the "real-life experience," which consists of living in the desired gender as a step toward further treatment. Benjamin Standards, Part Three, Section VII (1998). This includes cross-dressing in the desired gender, removal of facial or body hair for males desiring to become females, and living as a member of the opposite sex part-time, progressing to full-time. This treatment option, if successful, gives confidence and reassurance to both the mental health professional and the patient that further treatment can or should be attempted. If unsuccessful, this treatment option allows the individual to reassess his or her desires without the permanent, irreversible physical changes brought about by further treatment.

The two remaining treatment options result in permanent and irreversible [4] physical changes, and are administered under controlled conditions after the mental

of individuals with gender identity disorder. Benjamin Standards, Part One (1998). Both parties' experts agree that the Benjamin Standards are the authoritative guide to treating individuals with gender identity disorder.

4. Plaintiff's expert disputes the irreversibility of changes brought on by hormone therapy, claiming that although breast and nipple size will not revert back to their original contour after discontinuation of treatment, he has never seen nor heard of a case where reconstructive surgery was required to return the chest

to the male contour. Defendant's expert, however, points to the case of Renee Richards, who wrote a book about her experiences as an individual with gender identity disorder. Ms. Richards, while undergoing hormone therapy, changed her mind about becoming a biological female, and had to have breast reduction surgery to reverse the effects of the hormones. Defs.' Ex. A at 264–66. Additionally, the Benjamin Standards state that breast enlargement brought on by hormone therapy is not completely reversible. Benjamin Standards, Part Three, Section IX (1998).

health professional has determined that the individual is eligible and ready for such treatment. The first of these two options is hormone therapy. Benjamin Standards, Part Three, Section IX. In order to be eligible, the individual wishing to undertake hormone therapy must be at least 18 years of age, must have demonstrable knowledge of what hormones can and cannot do, as well as their social benefits and risks, and must have either a documented real-life experience for at least three months prior to the administration of hormones, or a period of psychotherapy of a duration specified by the treating mental health professional (usually at least three months). Benjamin Standards, Part Three, Section VIII.

An individual's readiness for hormone therapy is determined by three additional criteria: further consolidation of gender identity, either through real-life experience or psychotherapy; progress in mastering identified problems leading to improving or continuing stable mental health; and indication that the individual will take the hormones in a responsible manner. Once an individual is determined eligible *and* ready for hormone therapy, hormones are administered. *Id.*

Biological males undergoing hormone therapy can realistically expect breast growth and increase in nipple size, redistribution of body fat to approximate female proportions, decrease in upper body strength, softening of skin, decrease in body hair, slowing or stopping of scalp hair loss, decrease in fertility and testicular size, and less frequent and less firm erections.

The final and most drastic treatment option is sex reassignment surgery. Benjamin Standards, Part Three, Section XI (1998). To be eligible for such surgery, the individual must meet the following criteria: be of legal age of majority in that individual's nation of residence; have had twelve months of hormonal therapy without a medical contraindication; have had twelve months of successful continuous full-time real-life experience; have had regular responsible participation in psychotherapy throughout the real-life experience, if required by the mental health professional; have demonstrable knowledge of the cost, hospitalization time, likely complications, and rehabilitation requirements; and have awareness of different competent surgeons. Benjamin Standards, Part Three, Section X (1998). To be determined ready for surgery, the individual must additionally demonstrate progress in consolidating the evolving gender identity, as well as progress dealing with various interpersonal relationships in a significantly better state of mental health. *Id.*

In the instant case, these treatment options must be considered in light of the fact that Plaintiff is incarcerated, and her treatment will thus differ from the treatment of an individual who is not incarcerated. The most obvious difference is that because prison is very unlike "real-life", an incarcerated patient will not have "real-life experience" as a treatment option. Though real-life experience is not currently a prerequisite to hormone therapy, it is still an important treatment option, foreclosed by the patient's incarceration.

The treatment options for incarcerated individuals with gender identity disorder are further restricted by two policies of the BOP. First, the BOP's *Program Statement* provides in general that inmates will be given care that is either "medically mandatory" or "presently medically necessary". Bureau of Prisons *Program Statement* 6000.4, Ch. 1, Sec. 1, Mission Statement. Second, the BOP's *Program Statement* articulates a policy dealing specifically with the medical treatment of transsexuals undergoing hormone therapy. It is this second policy that is at issue in this case, and it provides:

It is the policy of the Bureau to maintain a transsexual inmate at the level of change existing upon admission. Should the Clinical Director determine that either progressive or regressive treatment changes are indicated, the Medical Director must approve these prior to im-

plementation. The use of hormones to maintain secondary sexual characteristics may be continued at approximately the same levels as prior to incarceration (with appropriate documentation from community physicians/hospitals) and with the Medical Director's approval.

*Id.* at Ch. 5, Section 14, Transsexuals. In contrast, inmates suffering from other mental illnesses, such as schizophrenia, depression, · or manic-depression, need not submit documentation of prior treatment in order to receive treatment for their illness while incarcerated.

The BOP has not provided Farmer with hormone therapy as treatment for her gender identity disorder, despite her assertion that she was prescribed and had been undergoing hormone therapy for several years prior to incarceration. Compl. at ¶ 12. Furthermore, neither party provides, nor do they make reference to, any documentation of her pre-incarceration treatment. Finally, BOP maintains that, even if she could meet the requirements for receiving hormones or if the Court found BOP's policy violated the Equal Protection Clause, BOP would still not administer hormones to Farmer because she has AIDS, and they are concerned about complications and risks to her health that may arise.

## II. Analysis

In its Memorandum Opinion of January 22, 1998, this Court granted Defendants' motion for summary judgment with respect to Plaintiff's claim that her Eighth Amendment right to receive treatment was violated by the BOP's refusal to adopt a new policy on treating transsexual prisoners. The Court also found that Dr. Kenneth Moritsugu, then-Medial Director of the BOP, did not have qualified immunity from a *Bivens* action in his individual capacity, for failure to order his staff to provide treatment to Plaintiff. Defendants appealed the issue of Dr. Moritsugu's qual-

ified immunity, and the D.C. Circuit Court of Appeals reversed this Court's ruling. Consequently, after appeal, the only claims remaining are Plaintiff's Equal Protection claim, and her Eighth Amendment claim against Defendants Kathleen Hawk–Sawyer and Dr. Newton Kendig[5] (in their official capacity) for failure to enforce the BOP's existing transsexual policy.

In her Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, Plaintiff fails to address Defendants' arguments for granting summary judgment in their favor on Plaintiff's Eighth Amendment claim. The Court thus considers this claim conceded, and grants summary judgment in favor of Defendants. *See Rafferty v. NYNEX Corp.,* 744 F.Supp. 324, 331 (D.D.C.1990) (holding that where plaintiff's memorandum in opposition to motion for summary judgment offers no rebuttal to defendants' argument, plaintiff may be deemed to have conceded that issue), *aff'd,* 60 F.3d 844 (D.C.Cir. 1995). The remainder of this Memorandum Opinion is thus devoted to addressing Plaintiff's Equal Protection claim.

### A. Standard of Review

Defendants have styled their motion as a Motion to Dismiss or, in the Alternative, for Summary Judgment. They argue that Plaintiff has failed to establish standing under the Equal Protection Clause, and furthermore cannot succeed on the merits of that claim. In support of their motion, Defendants submitted and relied upon the declaration of an expert, as well as several other documents. The Federal Rules of Civil Procedure require that if, on a motion to dismiss for failure to state a claim, the movants submit matters outside the pleadings which are not excluded by the court, the motion must be treated as one for summary judgment and disposed of in accordance with Rule 56. Fed.R.Civ.P. 12(b). Defendants' Motion requires con-

---

**5.** Dr. Moritsugu is no longer Medical Director of the BOP; he has been replaced by Dr. Newton Kendig. Because Dr. Moritsugu is

no longer being sued in his individual capacity, Dr. Kendig is substituted, pursuant to Fed. R.Civ.P. 25(d)(1).

sideration of matters outside the pleadings and will thus be treated as a Motion for Summary Judgment.

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether the movant has met this burden, a court must consider all factual inferences in the light most favorable to the non-moving party. *McKinney v. Dole,* 765 F.2d 1129, 1135 (D.C.Cir. 1985). Once the moving party makes its initial showing, however, the nonmoving party must demonstrate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *McKinney,* 765 F.2d at 1135.

## B. Equal Protection Claim

Plaintiff alleges that BOP's transsexual policy, requiring documentation of hormone therapy received prior to incarceration before the BOP will administer hormone therapy to the inmate, violates the Equal Protection Clause because inmates suffering from other mental illnesses, such as schizophrenia, depression, or manic-depression, need not document prior treatment in order to receive treatment while incarcerated.

■ To state a claim under the Equal Protection Clause, Plaintiff must meet three requirements. First, Plaintiff must show that she has standing to bring the claim. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Second, once she has shown standing, "[t]he threshold inquiry in evaluating an equal protection claim is ... 'to determine whether a person is similarly situated to those persons who allegedly received favorable treatment.'" *Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia,* 93 F.3d 910, 924 (D.C.Cir.1996) (quotation omitted), *cert. denied,* 520 U.S. 1196, 117 S.Ct. 1552, 137 L.Ed.2d 701 (1997). Third, Plaintiff must show that the requisite relationship between the disparate treatment and the government interest does not exist. To make this determination, the Court must determine whether the disparate treatment is based on a suspect classification or affects a fundamental right; if so, the Court must apply the strict scrutiny test, which requires that the law or policy be narrowly tailored to achieve a compelling government interest. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). If the disparate treatment is not based on a suspect classification and does not affect a fundamental right, the Court must apply the rational basis test, which requires that there be a rational relationship between the differential treatment and the government's legitimate purpose. *Id.*

### 1. Standing

■ Defendants contend that Plaintiff lacks standing to bring her Equal Protection claim because she has failed to show injury and redressibility. To prove standing, Plaintiff must show: (1) she has suffered a concrete, personal, and particularized "injury in fact" to a legally protected interest; (2) a causal connection between the injury and the action of the defendant, fairly traceable to the challenged action; and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130.

■ Defendants argue that Plaintiff cannot demonstrate an injury because at oral argument before our Court of Ap-

peals, Plaintiff admitted that she was not entitled to any particular treatment. Defendants, however, read too much into this admission. The only issue on appeal to the Court of Appeals was Plaintiff's Eighth Amendment claim against Dr. Moritsugu in his individual capacity, and Plaintiff's admission as to treatment was made in that limited context. In any event, whether or not Plaintiff is entitled to any specific treatment, she has clearly shown an injury in the instant case. Because Defendants' policy on treating transsexuals differs from its policy on treating individuals with other mental illnesses, Plaintiff has not received any consideration for the treatment she desires and believes appropriate. Plaintiff has thus been injured by the heightened documentation requirements applied only to transsexuals but not to inmates with other mental illnesses.

Defendants further argue that Plaintiff cannot show redressibility since the BOP's transsexual policy does not apply to her because she has AIDS. Defendants maintain that even if the BOP's policy requiring prior documentation before administration of hormone therapy was determined to violate the Equal Protection Clause, Plaintiff would still be ineligible for hormone therapy because she has AIDS.

Defendants, however, miss the point. Plaintiff is not claiming an entitlement to a specific form of treatment, but is only challenging, under the Equal Protection Clause, the BOP's differential consideration of her as a transsexual.[6] Consequently, because a determination by this Court that the BOP's policy on treating transsexual inmates *would* redress Plaintiff's injury, though it understandably would not guarantee her any particular treatment, Plaintiff does have standing to bring her Equal Protection claim.

---

6. Defendants admitted at oral argument that they do not have a policy that categorically denies hormone therapy to all inmates suffering from AIDS; they merely stated that BOP physicians have determined that they would not administer hormones to Plaintiff because of her particular condition.

## 2. Similarly Situated

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne,* 473 U.S. at 439, 105 S.Ct. 3249; *see also Women Prisoners,* 93 F.3d at 924.[7]

Defendants maintain that because the permanent physical changes brought about by hormone therapy are irreversible and specifically desired by the patient, inmates with gender identity disorder are not similarly situated to inmates with other mental illnesses. Defendants argue that no other mental disorder includes, as a treatment option, the administration of drugs whose *desired* effect (as opposed to unwanted side effects) is such drastic and irreversible physical changes. Defendants also argue that Plaintiff fails to indicate which mental disorders she alleges are similar to gender identity disorder, so that no meaningful comparison can be made.

Upon consideration of the experts' declarations, the Court finds that the following material facts are in dispute:

- whether gender identity disorder is a legitimate mental disorder;
- whether the effects of hormones are irreversible, and may require reconstructive surgery to return the contour of the chest to that of a biological male;
- whether the ambivalence about treatment among individuals suffering from gender identity disorder is unique, or whether it is common to most or all individuals suffering from other mental illnesses;

---

7. The Equal Protection Clause of the Fourteenth Amendment extends to the federal government through the Due Process Clause of the Fifth Amendment. *Bolling v. Sharpe,* 347 U.S. 497, 498–99, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

- whether it is common for individuals with other mental illnesses to frequently change their mind about their treatment, as happens to individuals with gender identity disorder;

- whether gender identity disorder is more difficult to diagnose, treat, and monitor than other mental illnesses;

- whether hormones can be used to treat the purely emotional or mental symptoms of gender identity disorder, in place of (and to the same extent as) other psychoactive drugs;

- whether hormones are "medically necessary", in light of the serious emotional consequences that may result from cessation of hormone treatment; and

- whether the physical changes brought about by hormone therapy, in and of itself, sufficiently differentiates individuals with gender identity disorder to justify differential treatment.

The declarations of Dr. Lehne and Dr. Brown clearly demonstrate their disagreement over these material and relevant facts. Such factual disagreements must be resolved with the aid of live testimony and cross-examination, so that the fact-finder (in this case, the Court) can make credibility determinations and make factual findings.

Plaintiff has thus established that there are material and relevant facts in dispute which preclude granting summary judgment as to whether Plaintiff is similarly situated to inmates suffering from other mental illnesses.

### 3. Rational Basis

■ Assuming, *arguendo*, that Plaintiff could establish that individuals with gen-

der identity disorder were similarly situated to individuals with other mental illnesses, Plaintiff would still have to show that BOP's policy lacked a rational basis for its differential application.

The parties agree that because BOP's policy neither disadvantages a suspect class nor impinges on the exercise of a fundamental right, the applicable standard in this case is rational basis. Rational basis review requires only that the disputed policy be rationally related to a legitimate government interest.

Both parties' experts agree that gender identity disorder is very difficult to diagnose and treat. A patient's self-reporting of his or her condition and current level of treatment cannot be taken at face value, but must be evaluated by properly trained professionals. The BOP's policy is to maintain an individual with gender identity disorder at the level of change that existed when that individual was admitted. For that reason, BOP will only administer hormones at the same levels the inmate was receiving prior to incarceration provided the inmate can supply appropriate documentation. This policy thus furthers the legitimate government interest of protecting the mental and physical health and safety of the inmate, which are BOP's responsibility. BOP's policy is a rational response to legitimate health and safety concerns: hormone therapy brings about drastic and permanent physical changes, and must be closely monitored by trained professionals. Moreover, such treatment cannot be administered lightly, or merely upon the basis of self-reporting. Some independent verification of the inmate's treatment is necessary to ensure the safety and health of the inmate.[8] Further

---

8. It is important to note that the BOP policy does not preclude putting an inmate on hormone therapy after admission; if the Clinical Director of the facility determines that such treatment is warranted and the Medical Director approves, that inmate would be able to undergo such treatment while incarcerated. The BOP policy in question, however, concerns the administration of hormone therapy where the Clinical Director and

Medical Director have not independently made such determinations; under these circumstances, requiring verification from community physicians and hospitals that the inmate is in fact undergoing hormone therapy is an eminently prudent policy, rationally related to the legitimate government interest of protecting the health and safety of the inmate.

128

conclusive evidence of the rationality of BOP's policy is the fact that it is consistent with the Benjamin Standards' policy on treatment of transsexual inmates.

### III. Conclusion

Plaintiff has conceded that she has failed to state an Eighth Amendment claim by failing to respond to Defendants' arguments for summary judgment. Summary judgment is therefore granted in favor of Defendants.

Plaintiff does have standing to bring her Equal Protection claim, and has demonstrated that there are material and relevant facts in dispute which preclude determining whether she is similarly situated to inmates with other mental illnesses. However, even assuming that Plaintiff could show she was similarly situated to other inmates, she cannot demonstrate that the BOP's policy lacks a rational basis. Consequently, Defendants' Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment [# 111] is hereby **granted,** and this case is **dismissed.**