Gale, Judge: Respondent determined a deficiency of $5,679 in petitioner’s Federal income tax for 2001. After concessions,[1] the issue for decision is whether petitioner may deduct as a medical care expense under section 213[2] amounts paid in 2001 for hormone therapy, sex reassignment surgery, and breast augmentation surgery that petitioner contends were incurred in connection with a condition known as gender identity disorder. FINDINGS OF FACT Many of the facts have been stipulated, and the stipulated facts and attached exhibits are incorporated in our findings by this reference. The parties have stipulated that this case is appealable to the U.S. Court of Appeals for the First Circuit. I. Petitioner’s Background Rhiannon G. O’Donnabhain (petitioner) was born a genetic male with unambiguous male genitalia. However, she[3] was uncomfortable in the male gender role from childhood and first wore women’s clothing secretly around age 10. Her discomfort regarding her gender intensified in adolescence, and she continued to dress in women’s clothing secretly. As an adult, petitioner earned a degree in civil engineering, served on active duty with the U.S. Coast Guard, found employment at an engineering firm, married, and fathered three children. However, her discomfort with her gender persisted. She felt that she was a female trapped in a male body, and she continued to secretly wear women’s clothing. Petitioner’s marriage ended after more than 20 years. After separating from her spouse in 1992, petitioner’s feelings that she wanted to be female intensified and grew more persistent.[4] II. Petitioner’s Psychotherapy and Diagnosis By mid-1996 petitioner’s discomfort with her male gender role and desire to be female intensified to the point that she sought out a psychotherapist to address them. After investigating referrals, petitioner contacted Diane Ellaborn (Ms. Ellaborn), a licensed independent clinical social worker (licsw) and psychotherapist, and commenced psychotherapy sessions in August 1996. Although not a medical doctor, Ms. Ellaborn had a master’s degree in social work and as an LICSW was authorized under Massachusetts law to diagnose and treat psychiatric illnesses. She had specialized training in the diagnosis and treatment of gender-related disorders. During petitioner’s psychotherapy Ms. Ellaborn learned of petitioner’s cross-dressing history and of her longstanding belief that she was really female despite her male body. Ms. Ellaborn observed that petitioner was very sad and anxious, had very low self-esteem, had limited social interactions, and was obsessed with issues concerning the incongruence between her perceived gender and her anatomical sex. In early 1997, after approximately 20 weekly individual therapy sessions, Ms. Ellaborn’s diagnosis was that petitioner was a transsexual suffering from severe gender identity disorder (GID), a condition listed in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000 text revision) (DSM-IV-TR), published by the American Psychiatric Association. The DSM-IV-TR states that a diagnosis of GID is indicated where an individual exhibits (1) a strong and persistent desire to be, or belief that he or she is, the other sex; (2) persistent discomfort with his or her anatomical sex, including a preoccupation with getting rid of primary or secondary sex characteristics; (3) an absence of any physical intersex (hermaphroditic) condition; and (4) clinically significant distress or impairment in social, occupational, or other important areas of functioning as a result of the discomfort arising from the perceived incongruence between anatomical sex and perceived gender identity.[5] See DSM-IV — TR at 581. Under the classification system of the DSM-rv-TR, a severity modifier — mild, moderate, or severe— may be added to any diagnosis.[6] The term “transsexualism” is currently used in the DSM-rv-TR to describe GID symptoms that are severe or profound.[7] Both the dsm-iv-tr and its predecessor the DSM-rv contain the following “Cautionary Statement”: The purpose of DSM-IV is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat people with various mental disorders. It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category * * * does not imply that the condition meets legal or other non-medical criteria for what constitutes mental disease, mental disorder, or mental disability. * * * III. Treatment of GID The World Professional Association for Transgender Health (wpath), formerly known as the Harry Benjamin International Gender Dysphoria Association, Inc., is an association of medical, surgical, and mental health professionals specializing in the understanding and treatment of GID.[8] WPATH publishes “Standards of Care” for the treatment of GID (hereinafter Benjamin standards of care or Benjamin standards). The Benjamin standards of care were originally approved in 1979 and have undergone six revisions through February 2001. Summarized, the Benjamin standards of care prescribe a “triadic” treatment sequence for individuals diagnosed with GID consisting of (1) hormonal sex reassignment; i.e., the administration of cross-gender hormones to effect changes in physical appearance to more closely resemble the opposite sex;[9] (2) the “real-life” experience (wherein the individual undertakes a trial period of living full time in society as a member of the opposite sex); and (3) sex reassignment surgery, consisting of genital sex reassignment and/or nongen-ital sex reassignment, more fully described as follows: Genital surgical sex reassignment refers to surgery of the genitalia and/ or breasts performed for the purpose of altering the morphology in order to approximate the physical appearance of the genetically other esx [sic] in persons diagnosed as gender dysphoric. * * * Non-genital surgical sex reassignment refers to any and all other surgical procedures of non-genital, or non-breast, sites (nose, throat, chin, cheeks, hips, etc.) conducted for the purpose of effecting a more masculine appearance in a genetic female or for the purpose of effecting a more feminine appearance in a genetic male in the absence of identifiable pathology which would warrant such surgery regardless of the patient’s genetic sex (facial injuries, hermaphroditism, etc.). Under the Benjamin standards, an individual must have the recommendation of a licensed psychotherapist to obtain hormonal or surgical sex reassignment. Hormonal sex reassignment requires the recommendation of one psychotherapist and surgical sex reassignment requires the recommendations of two.[10] The recommending psychotherapist should have diagnostic evidence for transsexualism for a period of at least 2 years, independent of the patient’s claims. The Benjamin standards state that hormonal sex reassignment should precede surgical sex reassignment because the patient’s degree of satisfaction with hormone therapy “may indicate or contraindicate later surgical sex reassignment.” The Benjamin standards further state that “Genital sex reassignment shall be preceded by a period of at least 12 months during which time the patient lives full-time in the social role of the genetically other sex.” The standards provide that breast augmentation surgery may be performed as part of sex reassignment surgery for a male-to-female patient “if the physician prescribing hormones and the surgeon have documented that breast enlargement after undergoing hormone treatment for 18 months is not sufficient for comfort in the social gender role.” IV. Ms. Ellaborn’s Treatment Plan for Petitioner After diagnosing severe GID in petitioner in early 1997, Ms. Ellaborn administered a course of treatment that followed the Benjamin standards of care.[11] A. Petitioner’s Hormone Treatments In February 1997 Ms. Ellaborn referred petitioner to an endocrinologist for feminizing hormone therapy, and petitioner commenced taking hormones in September 1997.[12] She remained on feminizing hormones continuously through the taxable year in issue (2001).[13] After beginning hormone therapy petitioner told Ms. Ellaborn that she felt calmer and better emotionally and that she felt positive about her physical changes. Ms. Ellaborn viewed petitioner’s positive reactions to hormone therapy as validation of the GID diagnosis. Petitioner advised her former spouse and children of her GID diagnosis in 1997 and 1998, respectively.[14] B. Petitioner’s “Real-Life” Experience In consultation with Ms. Ellaborn, petitioner decided to undertake the Benjamin standards’ “real-life” experience; i.e., to present in public as female on a full-time basis in March 2000. Petitioner legally changed her name from Robert Donovan to Rhiannon G. O’Donnabhain and arranged to have the gender designation on her driver’s license changed, on the basis of her GID diagnosis.[15] She underwent surgery to feminize her facial features,[16] and with the cooperation of her employer commenced presenting as a female at work around April of that year. Petitioner informed Ms. Ellaborn that her transition at work went smoothly and that the “real-life” experience had been “incredibly easy”. Ms. Ellaborn viewed petitioner’s positive response to her “real-life” experience as further validation of the GID diagnosis. C. Petitioner’s Sex Reassignment Surgery Petitioner’s anxiety as a result of having male genitalia persisted,[17] however, and Ms. Ellaborn concluded that her prognosis without genital surgical sex reassignment (sex reassignment surgery) was poor, in that petitioner’s anxiety over the lack of congruence between her perceived gender and her anatomical sex would continue in the absence of surgery and would impair her ability to function normally in society. In November 2000 Ms. Ellaborn wrote a referral letter to Dr. Toby Meltzer (Dr. Meltzer), a board-certified plastic and reconstructive surgeon, with over 10 years’ experience specializing in sex reassignment surgery, to secure a place for petitioner on his waiting list. After three additional therapy sessions with petitioner in mid-2001, Ms. Ellaborn concluded that petitioner had satisfied or exceeded all of the Benjamin standards’ criteria for sex reassignment surgery, including time spent satisfactorily on feminizing hormones and in the “real-life” experience. In July 2001 Ms. Ellaborn wrote a second letter to Dr. Meltzer certifying petitioner’s GID diagnosis and satisfaction of the Benjamin standards’ criteria for sex reassignment surgery, and formally recommending petitioner for the surgery. Another licensed psychotherapist with a doctoral degree in clinical psychology, Dr. Alex Coleman (Dr. Coleman), examined petitioner and provided a second recommendation for her sex reassignment surgery, as required by the Benjamin standards. Dr. Coleman’s letter to Dr. Meltzer observed that petitioner “appears to have significant breast development secondary to hormone therapy”. Petitioner, anticipating the formal recommendations for her surgery, went for a consultation and examination by Dr. Meltzer in June 2001 at his offices in Portland, Oregon. Dr. Meltzer concluded that petitioner was a good candidate for sex reassignment surgery. Dr. Meltzer’s notes of his physical examination of petitioner state: “Examination of her breasts reveal [sic] approximately B cup breasts with a very nice shape.” In mid-October 2001 petitioner returned to Portland, and she underwent sex reassignment surgery on October 19, 2001. The procedures that Dr. Meltzer carried out included surgical removal of the penis and testicles and creation of a vaginal space using genital skin and tissue. The procedures were designed to surgically reconfigure petitioner’s male genitalia to create female genitalia both in appearance and in function, by reconstructing the penile glans into a neo-clit-oris, making sexual arousal and intercourse possible. Dr. Meltzer also performed breast augmentation surgery designed to make petitioner’s breasts, which had experienced some development as a result of feminizing hormones, more closely resemble the breasts of a genetic female. In May 2002 Dr. Meltzer performed followup surgery on petitioner to refine the appearance of her genitals and remove scar tissue. In February 2005 Dr. Meltzer performed further surgery on petitioner’s face, designed to feminize her facial features.[18] V. Petitioner’s Claim for a Medical Expense Deduction During 2001 petitioner incurred and paid the following expenses (totaling $21,741) in connection with her hormone therapy, sex reassignment surgery, and breast augmentation surgery: (1) $19,195 to Dr. Meltzer for surgical procedures, including $14,495 for vaginoplasty and other procedures, $4,500 for breast augmentation, and $200 towards a portion of petitioner’s postsurgical stay at Dr. Meltzer’s facility; (2) $60 for medical equipment; (3) $1,544 in travel and lodging costs away from home for presurgical consultation and surgery; (4) $300 to Ms. Ellaborn for therapy; (5) $260 for the consultation for a second referral letter for surgery; and (6) $382 for hormone therapy. These payments were not compensated for by insurance or otherwise. On her Federal income tax return for 2001, petitioner claimed an itemized deduction for the foregoing expenditures as medical expenses, which respondent subsequently disallowed in a notice of deficiency. VI. Expert Testimony A. Petitioner’s Expert: Dr. Brown Petitioner’s expert, Dr. George R. Brown (Dr. Brown), is a licensed physician, board certified in adult psychiatry by the American Board of Psychiatry and Neurology. Dr. Brown has been a member of the American Psychiatric Association since 1983 and was elected a Distinguished Fellow of that organization in 2003. At the time of trial Dr. Brown was a professor and associate chairman of the Department of Psychiatry at East Tennessee State University and chief of psychiatry at James H. Quillen Veterans Affairs Medical Center in Johnson City, Tennessee. Dr. Brown has been an active member of WPATH since 1987, including serving on its board of directors, and he participated in the development of the Benjamin standards of care. He has seen approximately 500 GID patients either in a clinical setting or as an academic researcher. Dr. Brown has published numerous papers in peer-reviewed medical journals and written several book chapters on topics related to GID, including those in the Merck Manuals, one of the most widely used medical reference texts in the world. Citing its recognition in the dsm-iv-tr, standard medical reference texts, and World Health Organization publications, Dr. Brown contends that there is general agreement in mainstream psychiatry that GID is a legitimate mental disorder. Dr. Brown indicates that there are no biological or laboratory tests that may be used to diagnose GID but notes the same is true of virtually all of the mental disorders listed in the DSM-rV-TR. In Dr. Brown’s view, proper medical treatment of a person diagnosed with GID includes extended psychotherapy and one or more of the triadic therapies in the Benjamin standards. Dr. Brown is not aware of any case in which psychotherapy alone was effective in treating severe GID. For individuals with severe GID, Dr. Brown believes completion of the entire triadic sequence, i.e., through sex reassignment surgery, is usually medically necessary to “cure or mitigate the distress and maladaption caused by GID.” In Dr. Brown’s opinion, it is also important to the mental health of a male with severe GID to be able to “pass” convincingly in public as female — that is, to be perceived as female by members of the public. Failure to pass exacerbates the anxieties associated with GID. Passing includes the use of sex-segregated facilities such as restrooms and locker rooms, where a failure to pass can result in public humiliation, assault, or arrest. Genetic males with GID sometimes have distinctly male facial features that make it difficult to pass, absent surgery to feminize facial features. According to Dr. Brown, autocastration, autopenectomy, and suicide have been reported in patients who did not receive appropriate treatment for their GID. Dr. Brown rejects the idea that sex reassignment surgery is comparable to cosmetic surgery or is undertaken to improve one’s appearance, in view of the social stigma (including rejection by family and employment discrimination) and the pain and complications typically associated with such surgery. Moreover, Dr. Brown observes, normal genetic males generally do not desire to have their penis and testicles removed. Such a desire is regarded in the psychiatric literature as a likely manifestation of psychosis (usually schizophrenia) or GID, followed by a range of other less likely explanations. In Dr. Brown’s opinion, people undergo sex reassignment surgery because of the severity of their GID symptoms and the lack of any other known effective treatment. In Dr. Brown’s view, the scientific literature demonstrates positive therapeutic outcomes from sex reassignment surgery. He cites widely used psychiatric reference texts that reach the same conclusion.[19] On the basis of a review of petitioner’s medical records and a telephone interview with petitioner, Dr. Brown opined that petitioner was properly diagnosed with GID and petitioner’s treatments, including sex reassignment surgery, were appropriate and medically necessary. B. Respondent’s Expert: Dr. Schmidt Respondent’s expert, Dr. Chester W. Schmidt, Jr. (Dr. Schmidt), is a licensed physician, board certified in psychiatry by the American Board of Psychiatry and Neurology, and a member of the American Psychiatric Association. At the time of trial Dr. Schmidt was a professor of psychiatry at the Johns Hopkins University School of Medicine, the chief medical director, Johns Hopkins Health Care, and chair of the medical board, Johns Hopkins Bayview Medical Center. Dr. Schmidt cofounded the Sexual Behavior Consultation Unit of the Johns Hopkins Hospital, a clinical, teaching, and research program devoted to the evaluation and treatment of sexual disorders, in 1971. Since that time he has been active in the clinical and teaching aspects of transsexualism, having participated in the evaluation of approximately 12 patients per year diagnosed with GID. However, he has not directly treated or managed a patient with GID since the mid-1980s, and his current clinical activity consists of evaluating new cases of GID. Dr. Schmidt’s expert report states that he has “participated in the publication” of several peer-reviewed medical journal articles about GID, but none has been identified for which he was a listed author, and he has never written a chapter on the subject in a medical reference text. In his expert report, Dr. Schmidt asserts that the validity of the GID diagnosis remains the subject of debate within the psychiatric profession and that he currently is undecided about its validity.[20] However, 10 months before submitting his expert report, Dr. Schmidt provided a diagnosis of GID as an expert in a U.S. District Court proceeding and continued to make the diagnosis regularly through the time of trial, as do other practitioners at the Johns Hopkins sexual disorders clinic he cofounded. Further, Dr. Schmidt states that the GID diagnosis is taught to psychiatrists in training at his and other medical schools and is a condition with which they must be familiar. Dr. Schmidt agreed that GID requires treatment. He has observed that “you can’t walk around day after day being ambiguous about your gender identity. It will tear you apart psychologically”. Dr. Schmidt likewise agreed that untreated GID in males can sometimes lead to autopenectomy, autocastration, and suicide. Dr. Schmidt believes that the Benjamin standards of care are merely guidelines rather than true standards of care, in that they do not meet the legal threshold of a “community” standard, the departure from which would constitute malpractice. Dr. Schmidt further believes that the Benjamin standards enjoy only limited acceptance in American medicine generally. He is unaware, however, of any significant disagreement with the Benjamin standards within the psychiatric profession, other than a minority that considers sex reassignment surgery unethical. Dr. Schmidt agrees with the Benjamin standards’ treatment protocols, with the exception that he believes psychotherapy should be mandatory rather than merely recommended for candidates for sex reassignment. All GID patients at the sexual disorders clinic where Dr. Schmidt practices are advised to become familiar with the Benjamin standards of care. Dr. Schmidt believes that cross-gender hormone therapy and sex reassignment surgery have recognized medical and psychiatric benefits for persons suffering from GID, including reinforcement of an internal sense of consistency and balance in their gender identity. Dr. Schmidt has also expressed the view that once a genetic male with GID makes the decision to transition to a female identity, everything that reinforces the identity is helpful for psychological well-being. However, in his opinion a therapist should remain neutral regarding whether a patient should undergo hormone therapy or the surgery because, Dr. Schmidt believes, there is insufficient scientific evidence of the procedures’ efficacy in treating GID. A therapist should accordingly only take a position when there are contraindications to the procedures, in his opinion. Given his view that failure to adhere to the Benjamin standards of care would not constitute malpractice and that a therapist should remain neutral regarding the administration of hormone therapy or sex reassignment surgery, Dr. Schmidt concludes that the procedures are elective and not medically necessary. He acknowledges, however, that the issue of the medical necessity of sex reassignment surgery is “contentious and variable within American medicine.” Finally, while noting that there is some evidence that GID may have a neurological cause, Dr. Schmidt believes that there is no conclusive scientific proof that GID is the result of a genetic or congenital abnormality. C. Respondent’s Expert: Dr. Dietz Respondent’s expert, Dr. Park Dietz (Dr. Dietz), is a licensed physician and board certified in psychiatry by the American Board of Psychiatry and Neurology. Like Dr. Brown, he is a Distinguished Fellow of the American Psychiatric Association. At the time of trial Dr. Dietz was a clinical professor of psychiatry and behavioral sciences at the University of California at Los Angeles School of Medicine. Dr. Dietz’ specialty is forensic psychiatry, and he has written approximately 100 professional publications, mostly on sexual, criminal, and antisocial behavior from the standpoint of forensic psychiatry, in peer-reviewed journals, reference text chapters, and other media. Dr. Dietz was recognized as an expert in forensic psychiatry. He was retained by respondent for the purpose of addressing the question of whether GID or transsexualism is a disease or illness. It is Dr. Dietz’ opinion that GID is a mental disorder, susceptible of a correct or incorrect diagnosis, but not a disease or an illness because it has not been shown to arise from a pathological process within the body — a necessary condition for a disease in Dr. Dietz’ view.[21] While acknowledging that commentators on the subject have advanced at least three possible “sufficient conditions” for the presence of disease (namely, discomfort, dysfunction, or pathology), Dr. Dietz considers pathology the appropriate sufficient condition. Thus, in Dr. Dietz’ opinion, disease is defined as follows: To be a disease, a condition must arise as a result of a pathological process. It is not necessary that this process be fully known or understood, but it is necessary that the pathology occur within the individual and reflect abnormal structure or function of the body at the gross, microscopic, molecular, biochemical, or neuro-chemical levels. * * * Citing the cautionary statement in the dsm-iv-tr (to the effect that inclusion of a condition in a diagnostic category of the DSM does not imply that the condition meets legal criteria for mental disease), Dr. Dietz asserts that the designation of a condition as a mental disorder in the DSM — IV—TR does not indicate that the condition is a disease. To be a disease, a mental disorder must have a demonstrated organic or biological origin in the individual, in his view. Dr. Dietz testified that since qualification as a disease under his definition depends upon a demonstration of the condition’s organic origins, a condition may be a disease but not known as such, pending scientific discoveries concerning its etiology. For example, panic disorder and obsessive-compulsive disorder are now understood to have an organic basis, but their etiology was only discovered as a result of laboratory advances within the last decade or so. Thus, both conditions are diseases under Dr. Dietz’ definition, but would not have been recognized as such 20 years ago. Dr. Dietz confirmed that bulimia[22] is psychologically unhealthy but not a disease under his formulation because it has no demonstrated organic etiology. Dr. Dietz was unable to say whether anorexia[23] is a disease under his definition because he was unfamiliar with the current state of scientific knowledge of anorexia’s etiology. In Dr. Dietz’ view, post-traumatic stress disorder is not a disease as he defines the term, but an injury. Dr. Dietz agrees that GID is sometimes associated with autopenectomy, autocastration, and suicide. OPINION I. Medical Expense Deductions Under Section 213 A. In General Section 213(a) allows a deduction for expenses paid during the taxable year for medical care that are not compensated for by insurance or otherwise and to the extent that such expenses exceed 7.5 percent of adjusted gross income.[24] In addition, section 213(d)(1)(B) and (2) provides that certain amounts paid for transportation and lodging, respectively, may qualify as amounts paid for medical care under section 213(a) if a taxpayer’s travel away from home is primarily for and essential to receiving medical care.[25] B. Definition of Medical Care Congress first provided an income tax deduction for medical expenses in 1942. See Revenue Act of 1942, ch. 619, sec. 127(a), 56 Stat. 825. The original provision was codified as section 23(x) of the 1939 Internal Revenue Code and read as follows: SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: ‡ ij; (x) Medical, Dental, Etc., Expenses. — Except as limited under paragraph (1) or (2), expenses paid during the taxable year * * * for medical care of the taxpayer * * *. The term “medical care”, as used in this subsection, shall include amounts paid for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body * * *. At the time, the Senate Committee on Finance commented on the new deduction for medical expenses in relevant part as follows: The term “medical care” is broadly defined to include amounts paid for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body. It is not intended, however, that a deduction should be allowed for any expense that is not incurred primarily for the prevention or alleviation of a physical or mental defect or illness. S. Rept. 1631, 77th Cong., 2d sess. 95-96 (1942), 1942-2 C.B. 504, 576-577 (emphasis added); see Stringham v. Commissioner, 12 T.C. 580, 583-584 (1949) (medical care is defined in broad and comprehensive language, but it does not include items which are primarily nondeductible personal living expenses), affd. 183 F.2d 579 (6th Cir. 1950). The core definition of “medical care” originally set forth in section 23(x) of the 1939 Code has endured over time and is currently found in section 213(d)(1)(A), which provides as follows: SEC. 213 (d). Definitions. — For purposes of this section— (1) The term “medical care” means amounts paid— (A) for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body * * * Thus, since the inception of the medical expense deduction, the definition of deductible “medical care” has had two prongs. The first prong covers amounts paid for the “diagnosis, cure, mitigation, treatment, or prevention of disease” and the second prong covers amounts paid “for the purpose of affecting any structure or function of the body”. The regulations interpreting the statutory definition of medical care echo the description of medical care in the Senate Finance Committee report accompanying the original enactment. The regulations state in relevant part: (e) Definitions — (1) General, (i) The term “medical care” includes the diagnosis, cure, mitigation, treatment, or prevention of disease. Expenses paid for “medical care” shall include those paid for the purpose of affecting any structure or function of the body or for transportation primarily for and essential to medical care. * * * (ii) * * * Deductions for expenditures for medical care allowable under section 213 will be confined strictly to expenses incurred primarily for the prevention or alleviation of a physical or mental defect or illness. * * * [Sec. 1.213 — 1(e)(1), Income Tax Regs.; emphasis added.] Notably, the regulations, mirroring the language of the Finance Committee report, treat “disease” as used in the statute as synonymous with “a physical or mental defect or illness.” The language equating “mental defect” with “disease” was in the first version of the regulations promulgated in 1943 and has stood unchanged since. See T.D. 5234, 1943 C.B. 119, 130. In addition, to qualify as “medical care” under the regulations, an expense must be incurred “primarily” for alleviation of a physical or mental defect, and the defect must be specific. “[A]n expenditure which is merely beneficial to the general health of an individual, such as an expenditure for a vacation, is not an expenditure for medical care.” Sec. 1.213 — 1(e)(1)(ii), Income Tax Regs. Given the reference to “mental defect” in the legislative history and the regulations, it has also long been settled that “disease” as used in section 213 can extend to mental disorders. See, e.g., Fischer v. Commissioner, 50 T.C. 164, 173 n.4 (1968) (“That mental disorders can be ‘disease’ within the meaning of [section 213(d)(1)(A)] is no longer open to question.”); Starrett v. Commissioner, 41 T.C. 877 (1964); Hendrick v. Commissioner, 35 T.C. 1223 (1961). In Jacobs v. Commissioner, 62 T.C. 813 (1974), this Court reviewed the legislative history of section 213 and synthesized the caselaw to arrive at a framework for analysis of disputes concerning medical expense deductions. Noting that the medical expense deduction essentially carves a limited exception out of the general rule of section 262 that “personal, living, or family expenses” are not deductible, the Court observed that a taxpayer seeking a deduction under section 213 must show: (1) “the present existence or imminent probability of a disease, defect or illness — mental or physical” and (2) a payment “for goods or services directly or proximately related to the diagnosis, cure, mitigation, treatment, or prevention of the disease or illness.” Id. at 818. Moreover, where the expenditures are arguably not “wholly medical in nature” and may serve a personal as well as medical purpose, they must also pass a “but for” test: the taxpayer must “prove both that the expenditures were an essential element of the treatment and that they would not have otherwise been incurred for nonmedical reasons.” Id. at 819.[26] C. Definition of Cosmetic Surgery The second prong of the statutory definition of “medical care”, concerning amounts paid “for the purpose of affecting any structure or function of the body”, was eventually adjudged too liberal by Congress. The Internal Revenue Service, relying on the second prong, had determined in two revenue rulings that deductions were allowed for amounts expended for cosmetic procedures (such as facelifts, hair transplants, and hair removal through electrolysis) because the procedures were found to affect a structure or function of the body within the meaning of section 213(d)(1)(A). See Rev. Rul. 82-111, 1982-1 C.B. 48 (hair transplants and hair removal); Rev. Rul. 76-332, 1976-2 C.B. 81 (facelifts); see also Mattes v. Commissioner, 77 T.C. 650 (1981) (hair transplants to treat premature baldness deductible under section 213). In 1990 Congress responded to these rulings by amending section 213 to include new subsection (d)(9) which, generally speaking, excludes cosmetic surgery from the definition of deductible medical care. See Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11342(a), 104 Stat. 1388-471. A review of the legislative history of section 213(d)(9) shows that Congress deemed the amendment necessary to clarify that deductions for medical care do not include amounts paid for “an elective, purely cosmetic treatment”. H. Conf. Rept. 101-964, at 1031 (1990), 1991-2 C.B. 560, 562; see also 136 Cong. Rec. 30485, 30570 (1990) (Senate Finance Committee report language on Omnibus Budget Reconciliation Act of 1990).[27] Section 213(d)(9) defines “cosmetic surgery” as follows: SEC. 213(d). Definitions. — For purposes of this section— ******* (9) Cosmetic surgery.— (A) In GENERAL. — The term “medical care” does not include cosmetic surgery or other similar procedures, unless the surgery or procedure is necessary to ameliorate a deformity arising from, or directly related . to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease. (B) Cosmetic surgery defined. — For purposes of this paragraph, the term “cosmetic surgery” means any procedure which is directed at improving the patient’s appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease. In sum, section 213(d)(9)(A) provides the general rule that the term “medical care” does not include “cosmetic surgery” (as defined) unless the surgery is necessary to ameliorate deformities of various origins. Section 213(d)(9)(B) then defines “cosmetic surgery” as any procedure that is directed at improving the patient’s appearance but excludes from the definition any procedure that “meaningfully [promotes] the proper function of the body” or “[prevents] or [treats] illness or disease”. There appear to be no cases of precedential value interpreting the cosmetic surgery exclusion of section 213(d)(9).[28] II. The Parties’ Positions Respondent contends that petitioner’s hormone therapy, sex reassignment surgery, and breast augmentation surgery are nondeductible “cosmetic surgery or other similar procedures”[29] under section 213(d)(9) because they were directed at improving petitioner’s appearance and did not treat an illness or disease, meaningfully promote the proper function of the body, or ameliorate a deformity. Although respondent concedes that GID is a mental disorder, respondent contends, relying on the expert testimony of Dr. Dietz, that GID is not a disease for purposes of section 213 because it does not arise from an organic pathology within the human body that reflects “abnormal structure or function of the body at the gross, microscopic, molecular, biochemical, or neurochemical levels.” Respondent further contends that the procedures at issue did not treat disease because there is no scientific proof of their efficacy in treating GID and that the procedures were cosmetic surgery because they were not medically necessary. Finally, respondent contends that petitioner did not have GID, that it was incorrectly diagnosed, and that therefore the procedures at issue did not treat a disease. Petitioner maintains that she is entitled to deduct the cost of the procedures at issue on the grounds that GID is a well-recognized mental disorder in the psychiatric field that “falls squarely within the meaning of ‘disease’ because it causes serious, clinically significant distress and impairment of functioning.” Since widely accepted standards of care prescribe hormone treatment, sex reassignment surgery, and, in appropriate circumstances, breast augmentation surgery for genetic males suffering from GID, expenditures for the foregoing constitute deductible “medical care” because a direct or proximate relationship exists between the expenditures and the “diagnosis, cure, mitigation, treatment, or prevention of disease”, petitioner argues. Morever, petitioner contends, because the procedures at issue treated a “disease” as used in section 213, they are not “cosmetic surgery” as defined in that section.[30] III. Analysis The availability of the medical expense deduction for the costs of hormonal and surgical sex reassignment for a transsexual individual presents an issue of first impression. A. Statutory Definitions Determining whether sex reassignment procedures are deductible “medical care” or nondeductible “cosmetic surgery” starts with the meaning of “treatment” and “disease” as used in section 213. Both the statutory definition of “medical care” and the statute’s exclusion of “cosmetic surgery” from that definition depend in part upon whether an expenditure or procedure is for “treatment” of “disease”. Under section 213(d)(1)(A), if an expenditure is “for the * * * treatment * * * of disease”, it is deductible “medical care”; under section 213(d)(9)(B), if a procedure “[treats] * * * disease”, it is not “cosmetic surgery” that is excluded from the definition of “medical care”.[31] Because the only difference between the quoted phrases in these two subparagraphs is the use of the noun form “treatment” versus the verb form “treat”, we see no meaningful distinction between them. “Code provisions generally are to be interpreted so congressional use of the same words indicates an intent to have the same meaning apply”. Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 241 (2002); see also Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152, 159 (1993); United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 236 (1955); Zuanich v. Commissioner, 77 T.C. 428, 442-443 (1981). Consequently, the determination of whether something is a “treatment” of a “disease” is the same throughout section 213, whether for purposes of showing that an expenditure is for “medical care” under section 213(d)(1)(A) or that a procedure is not “cosmetic surgery” under section 213(d)(9)(B). A showing that a procedure constitutes “treatment” of a “disease” both precludes “cosmetic surgery” classification under section 213(d)(9) and qualifies the procedure as “medical care” under section 213(d)(1)(A).[32] Congress’ reuse of the terms “treat” and “disease” in defining “cosmetic surgery” in section 213(d)(9)(B) triggers a second principle of statutory construction. Given that the phrase “treatment * * * of disease” as used in the section 213(d)(1)(A) definition of “medical care” had been the subject of considerable judicial and administrative construction when Congress incorporated the phrase into the definition of “cosmetic surgery” in 1990, it “had acquired a settled judicial and administrative interpretation”. Commissioner v. Keystone Consol. Indus., Inc., supra at 159. In these circumstances “it is proper to accept the already settled meaning of the phrase”. Id. Therefore, the pre-1990 caselaw and regulations construing “treatment” and “disease” for purposes of the section 213(d)(1)(A) definition of “medical care” are applicable to the interpretation of those words as used in the section 213(d)(9)(B) definition of “cosmetic surgery”. B. Is GID a “Disease”? Petitioner argues that she is entitled to deduct her expenditures for the procedures at issue because they were treatments for GID, a condition that she contends is a “disease” for purposes of section 213. Respondent maintains that petitioner’s expenditures did not treat “disease” because GID is not a “disease” within the meaning of section 213. Central to his argument is respondent’s contention that “disease” as used in section 213 has the meaning postulated by respondent’s expert, Dr. Dietz; namely, “a condition * * * [arising] as a result of a pathological process * * * [occurring] within the individual and [reflecting] abnormal structure or function of the body at the gross, microscopic, molecular, biochemical, or neuro-chemical levels.” On brief respondent cites the foregoing definition from Dr. Dietz’ expert report and urges it upon the Court as the meaning of “disease” as used in section 213; namely, that a “disease” for this purpose must have a demonstrated organic or physiological origin in the individual. Consequently, GID is not a “disease” because it has “no known organic pathology”, respondent argues.[33] However, this use of expert testimony to establish the meaning of a statutory term is generally improper. “[E]xpert testimony proffered solely to establish the meaning of a law is presumptively improper.” United States v. Prigmore, 243 F.3d 1, 18 n.3 (1st Cir. 2001). The meaning of a statutory term is a pure question of law that is “exclusively the domain of the judge.” Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997); see also United States v. Mikutowicz, 365 F.3d 65, 73 (1st Cir. 2004); Bammerlin v. Navistar Int'l. Transp. Corp., 30 F.3d 898, 900 (7th Cir. 1994); Snap-Drape, Inc. v. Commissioner, 105 T.C. 16, 19—20 (1995), affd. 98 F.3d 194, 198 (5th Cir. 1996). Closely analogous is S. Jersey Sand Co. v. Commissioner, 30 T.C. 360, 364 (1958), affd. 267 F.2d 591 (3d Cir. 1959), where this Court refused to consider the expert testimony of a geologist concerning the meaning of the term “quartzite” as used in the Internal Revenue Code. While the Court admitted Dr. Dietz’ expert report and allowed him to testify over petitioner’s objection, the use to which respondent now seeks to put his testimony is improper, and we disregard it for that purpose.[34] The meaning of “disease” as used in section 213 must be resolved by the Court, using settled principles of statutory construction, including reference to the Commissioner’s interpretive regulations, the legislative history, and caselaw precedent.[35] As a legal argument for the proper interpretation of “disease”, respondent’s position is meritless. Respondent cites no authority, other than Dr. Dietz’ expert testimony, in support of his interpretation, and we have found none. To the contrary, respondent’s interpretation is flatly contradicted by nearly a half century of caselaw. Numerous cases have treated mental disorders as “diseases” for purposes of section 213 without regard to any demonstrated organic or physiological origin or cause. See Fay v. Commissioner, 76 T.C. 408 (1981); Jacobs v. Commissioner, 62 T.C. at 818; Fischer v. Commissioner, 50 T.C. 164 (1968); Starrett v. Commissioner, 41 T.C. 877 (1964); Hendrick v. Commissioner, 35 T.C. 1223 (1961); Sims v. Commissioner, T.C. Memo. 1979-499. These cases found mental conditions to be “diseases” where there was evidence that mental health professionals regarded the condition as creating a significant impairment to normal functioning and warranting treatment. This Court’s discussion in Fay v. Commissioner, supra at 414-415, is representative: While the record is not too clear with respect to the precise nature of the mental conditions of * * * [the taxpayer’s children], we are satisfied that they both suffered from some sort of learning disability, accompanied by emotional stress, which prevented, or at least interfered with, their ability to cope in a normal academic environment. While this condition may or may not have been psychiatric, it was certainly a mental handicap or defect which we think may be considered a mental disease or defect for purposes of section 213. It was the type of disorder that the petitioners, their expert educational consultants, a psychiatrist, and the staff of the DLD program![36]! thought could be mitigated or alleviated, or possibly cured, by the special attention and individual programing given to the children at the DLD. While these mental disorders may not have been severe enough to require psychiatric or psychological treatment, they were severe enough to prevent the children from acquiring a normal education without some help, and we think any treatment, whether rendered by medical people or specially trained educators, directly related to the alleviation of such mental disorders so that the recipient may obtain a normal, or more normal, education, qualifies as medical care under the statute. In Fischer v. Commissioner, supra at 173-174, there was a similar absence of any discussion of organic or physiological origins in this Court’s analysis of the “conventional meaning” of “disease”. The first question presented is whether petitioner’s son, Don, was suffering from a “disease” as that term is used in the statute and the applicable regulation. Given that term its conventional meaning, we think the evidence is clear * * * that Don was suffering from a disease when he entered Oxford Academy. As detailed in our findings, the report of the Institute of the Pennsylvania Hospital states that as of that date Don had “not evolved the usual ‘defense’ or integrating mechanisms necessary for dealing maturely, realistically and in an organized fashion, with the problems of his environment. * * * ” * * * a psychiatrist who treated Don for almost a year, described him as a child with “significant neurotic blocks against learning.” * * * [Fn. ref. omitted.] See also Jacobs v. Commissioner, supra at 818 (taxpayer’s “severe depression” as evidenced by his psychiatrist’s testimony is “disease” for purposes of section 213); Hendrick v. Commissioner, supra at 1236 (“emotional insecurity” of child is a “disease” for purposes of section 213); Sims v. Commissioner, supra (“disease” for purposes of section 213 found although “record does not contain a precipe characterization of * * * [the taxpayer’s son’s] condition in medical terminology, there is ample evidence to support a finding that he suffered from some sort of learning disability, accompanied by emotional or psychiatric problems”). We have also considered a condition’s listing in a diagnostic reference text as grounds for treating the condition as a “disease”, without inquiry into the condition’s etiology. In Starrett v. Commissioner, supra at 878 & n.1, 880-882, a reviewed Opinion, we treated “anxiety reaction” as a “disease” for purposes of section 213, pointing to the condition’s recognition in the American Medical Association’s Standard Nomenclature of Diseases and Operations (5th ed. 1961). The absénce of any consideration of etiology in the caselaw is consistent with the legislative history and the regulations. Both treat “disease” as synonymous with “a physical or mental defect”, which suggests a more colloquial sense of the term “disease” was intended than the narrower (and more rigorous) interpretation for which respondent contends. In addition, in the context of mental disorders, it is virtually inconceivable that Congress could have intended to confine the coverage of section 213 to conditions with demonstrated organic origins when it enacted the provision in 1942, because physiological origins for mental disorders were not widely recognized at the time. As Dr. Dietz confirmed in his testimony, the physiological origins of various well-recognized mental disorders — for example, panic disorder and obsessive-compulsive disorder — were discovered only about a decade ago. Moreover, Dr. Dietz confirmed that bulimia would not constitute a “disease” under his definition, because bulimia has no demonstrated organic origin, nor would post-traumatic stress disorder. Dr. Dietz was unable to say whether anorexia would meet the definition because he was uncertain regarding the current state of scientific knowledge of its origins. Petitioner’s expert, Dr. Brown, testified without challenge that most mental disorders listed in the DSM-IV-TR do not have demonstrated organic causes. Thus, under the definition of “disease” respondent advances, many well-recognized mental disorders, perhaps most, would be excluded from coverage under section 213 — a result clearly at odds with the intent of Congress (and the regulations) to provide deductions for the expenses of alleviating “mental defects” generally. In sum, we reject respondent’s interpretation of “disease” because it is incompatible with the stated intent of the regulations and legislative history to cover “mental defects” generally and is contradicted by a consistent line of cases finding “disease” in the case of mental disorders without regard to any demonstrated etiology. Having rejected respondent’s contention that “disease” as used in section 213 requires a demonstrated organic origin, we are left with the question whether the term should be interpreted to encompass GID. On this score, respondent, while conceding that GID is a mental disorder, argues that GID is “not a significant psychiatric disorder” but instead is a “social construction” — a “social phenomenon” that has been “medicalized”. Petitioner argues that GID is a “disease” for purposes of section 213 because it is well recognized in mainstream psychiatric literature, including the DSM-IV-TR, as a legitimate mental disorder that “causes serious, clinically significant distress and impairment of functioning”. For the reasons already noted and those discussed below, we conclude that GID is a “disease” within the meaning of section 213. We start with the two caselaw factors influencing a finding of “disease” in the context of mental conditions: (1) A determination by a mental health professional that the condition created a significant impairment to normal functioning, warranting treatment, see Fay v. Commissioner, 76 T.C. 408 (1981); Jacobs v. Commissioner, 62 T.C. 813 (1974); Fischer v. Commissioner, 50 T.C. 164 (1968); Hendrick v. Commissioner, 35 T.C. 1223 (1961), or (2) a listing of the condition in a medical reference text, see Starrett v. Commissioner, 41 T.C. 877 (1964). Both factors involve deference by a court to the judgment of medical professionals. As noted in our findings, GID is listed as a mental disorder in the DSM-rv-TR, which all three experts agree is the primary diagnostic tool of American psychiatry.[37] See also Danaipour v. McLarey, 286 F.3d 1, 17 (1st Cir. 2002) (characterizing the DSM-IV as “the leading psychiatric diagnostic manual”). GID or transsexualism is also listed in numerous medical reference texts, with descriptions of their characteristics that are similar to those in the DSM-IV-TR.[38] See Starrett v. Commissioner, supra. Even if one accepts respondent’s expert Dr. Schmidt’s assertion that the validity of the GID diagnosis is subject to some debate in the psychiatric profession, the widespread recognition of the condition in medical literature persuades the Court that acceptance of the GID diagnosis is the prevailing view. Dr. Schmidt’s own professed misgivings about the diagnosis are not persuasive, given that he continues to employ the diagnosis in practice, believes that psychiatrists must be familiar with it, and recently gave a GID diagnosis as an expert in another court proceeding.[39] On balance, the evidence amply demonstrates that gid is a widely recognized and accepted diagnosis in the field of psychiatry. Second, GID is a serious, psychologically debilitating condition. Respondent’s characterization of the condition on brief as a “social construction” and “not a significant psychiatric disorder” is undermined by both of his own expert witnesses and the medical literature in evidence. All three expert witnesses agreed that, absent treatment, GID in genetic males is sometimes associated with autocastration, autopenectomy, and suicide. Respondent’s expert Dr. Schmidt asserts that remaining ambiguous about gender identity “will tear you apart psychologically”. Petitioner’s expert Dr. Brown likewise testified that GID produces significant distress and maladaption. Psychiatric reference texts, established as reliable authority by Dr. Brown’s testimony, confirm the foregoing. See Fed. R. Evid. 803(18). One such text states: Cross-gender identity (gender identity contradicted by anatomical sex characteristics) in adulthood virtually always causes distress to the individual. * * * Cross-gender identity at any age, therefore, is appropriately regarded as a disorder and a possible reason for clinical intervention. * * * [Green & Blanchard, “Gender Identity Disorders”, in Kaplan & Sadock’s Comprehensive Textbook of Psychiatry 1646, 1659 (Sadock & Sadock, eds., 2000).] Another psychiatric reference text states that “Prior to recognition of transsexualism as a disorder deserving medical and psychiatric attention many patients self-mutilated or committed suicide out of despair.” Green, “Gender Identity Disorder in Adults”, in New Oxford Textbook of Psychiatry 914 (Gelder, et al., eds., 2000). Ms. Ellaborn concluded that petitioner exhibited clinically significant impairment from GID, to the extent that she designated petitioner’s condition as “severe” under the DSM-IV-TR standards. Her diagnosis was supported by another doctoral-level mental health professional and by Dr. Brown. The severity of petitioner’s impairment, coupled with the near universal recognition of GID in diagnostic and other medical reference texts, bring petitioner’s condition in line with the circumstances where a mental condition has been deemed a “disease” in the caselaw under section 213. Third, respondent’s position that GID is not a significant psychiatric disorder is at odds with the position of every U.S. Court of Appeals that has ruled on the question of whether GID poses a serious medical need for purposes of the Eighth Amendment, which has been interpreted to require that prisoners receive adequate medical care. See Estelle v. Gamble, 429 U.S. 97, 103 (1976). In Estelle v. Gamble, supra at 104, the U.S. Supreme Court held that “deliberate indifference to serious medical needs of prisoners constitutes the ‘unnecessary and wanton infliction of pain’ * * * proscribed by the Eighth Amendment.” The U.S. Courts of Appeals have accordingly interpreted Estelle v. Gamble, supra, as establishing a two-prong test for an Eighth Amendment violation: it must be shown that (1) the prisoner had a “serious medical need” which (2) was met with “deliberate indifference” by prison officials. See, e.g., Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000) (applying the Eighth Amendment test to a pretrial detainee); White v. Farrier, 849 F.2d 322, 325-327 (8th Cir. 1988). Seven of the U.S. Courts of Appeals that have considered the question have concluded that severe GID or transsexualism constitutes a “serious medical need” for purposes of the Eighth Amendment. See De’lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003); Allard v. Gomez, 9 Fed.Appx. 793, 794 (9th Cir. 2001); Cuoco v. Moritsugu, supra; Brown v. Zavaras, 63 F.3d 967, 970 (10th Cir. 1995); Phillips v. Mich. Dept. of Corr., 932 F.2d 969 (6th Cir. 1991), affg. 731 F. Supp. 792 (W.D. Mich. 1990); White v. Farrier, supra; Meriwether v. Faulkner, 821 F.2d 408, 411-413 (7th Cir. 1987); see also Maggert v. Hanks, 131 F.3d 670, 671 (7th Cir. 1997) (describing gender dysphoria as a “profound psychiatric disorder”).[40] No U.S. Court of Appeals has held otherwise.[41] Deliberate indifference “requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm.” De’lonta v. Angelone, supra at 634. Many of the foregoing opinions either found that “deliberate indifference” had not been shown or remanded to the District Court for further proceedings regarding that point, but they reflect a clear consensus that GID constitutes a medical condition of sufficient seriousness that it triggers the Eighth Amendment requirement that prison officials not ignore or disregard it.[42] In view of (1) GlD’s widely recognized status in diagnostic and psychiatric reference texts as a legitimate diagnosis, (2) the seriousness of the condition as described in learned treatises in evidence and as acknowledged by all three experts in this case; (3) the severity of petitioner’s impairment as found by the mental health professionals who examined her; (4) the consensus in the U.S. Courts of Appeals that GID constitutes a serious medical need for purposes of the Eighth Amendment, we conclude and hold that GID is a “disease” for purposes of section 213. C. Did Petitioner Have GID? Respondent also contends that petitioner was not correctly diagnosed with GID, citing his expert Dr. Schmidt’s contentions that certain comorbid conditions such as depression or transvestic fetishism had not been adequately ruled out as explanations of petitioner’s condition. We find that petitioner’s GID diagnosis is substantially supported by the record. Ms. Ellaborn was licensed under State law to make such a diagnosis. A second licensed professional concurred, as did petitioner’s expert, a recognized authority in the field. Ms. Ellaborn’s testimony concerning her diagnosis was persuasive. She considered and ruled out comorbid conditions, including depression and transvestic fetishism, and she believed her initial diagnosis was confirmed by petitioner’s experience with the steps in the triadic therapy sequence.[43] Absent evidence of a patent lack of qualifications, see, e.g., Flemming v. Commissioner, T.C. Memo. 1980-583 (rejecting diagnosis of cancer and kidney disease by dentist), this Court has generally deferred, in section 213 disputes, to the judgment of the medical professionals who treated the patient, see, e.g. Fay v. Commissioner, 76 T.C. at 414; Jacobs v. Commissioner, 62 T.C. at 818; Fischer v. Commissioner, 50 T.C. at 173-174. All three witnesses who supported petitioner’s GID diagnosis interviewed petitioner. Since Dr. Schmidt did not, his analysis is entitled to considerably less weight, and we conclude that there is no persuasive basis to doubt the diagnosis. D. Whether Cross-Gender Hormones, Sex Reassignment Surgery, and Breast Augmentation Surgery “Treat” GID 1. Cross-Gender Hormones and Sex Reassignment Surgery Our conclusions that GID is a “disease” for purposes of section 213, and that petitioner suffered from it, leave the question of whether petitioner’s hormone therapy, sex reassignment surgery, and breast augmentation surgery “[treated]” GID within the meaning of section 213(d)(1)(A) and (9)(B). In contrast to their dispute over the meaning of “disease”, the parties have not disputed the meaning of “treatment” or “treat” as used in section 213(d)(1)(A) and (9)(B), respectively. We accordingly interpret the words in their ordinary, everyday sense. See Crane v. Commissioner, 331 U.S. 1, 6 (1947); Old Colony R.R. Co. v. Commissioner, 284 U.S. 552, 560 (1932) (“‘The legislature must be presumed to use words in their known and ordinary signification’” (quoting Levy’s Lessee v. M’Cartee, 6 Pet. 102, 110 (1832))); see also Heard v. Commissioner, 269 F.2d 911, 912 (3d Cir. 1959) (“The words of * * * [section 213] are to be given their normal meaning without striving to read exceptions into them.”), revg. in part 30 T.C. 1093 (1958). “Treat” is defined in standard dictionaries as: “to deal with (a disease, patient, etc.) in order to relieve or cure”, Webster’s New Universal Unabridged Dictionary 2015 (2003); “to care for or deal with medically or surgically”, Merriam Webster’s Collegiate Dictionary 1333 (11th ed. 2008); “5 a: to care for (as a patient or part of the body) medically or surgically: deal with by medical or surgical means: give a medical treatment to * * * b: to seek cure or relief of * * * ”, Webster’s Third New International Dictionary 2435 (2002). The regulations provide that medical care is confined to expenses “incurred primarily for the prevention or alleviation of a physical or mental defect or illness”. Sec. 1.213-1(e)(1)(h), Income Tax Regs, (emphasis added). A treatment should bear a “direct or proximate therapeutic relation to the * * * condition” sufficient “to justify a reasonable belief the * * * [treatment] would be efficacious”. Havey v. Commissioner, 12 T.C. 409, 412 (1949). In Starrett v. Commissioner, 41 T.C. at 881, this Court concluded that the taxpayer’s psychoanalysis was a treatment of disease because the taxpayer was “thereby relieved of the physical and emotional suffering attendant upon” the condition known as anxiety reaction. Hormone therapy, sex reassignment surgery and, under certain conditions, breast augmentation surgery are prescribed therapeutic interventions, or treatments, for GID outlined in the Benjamin standards of care. The Benjamin standards are widely accepted in the psychiatric profession, as evidenced by the recognition of the standards’ triadic therapy sequence as the appropriate treatment for GID and transsexualism in numerous psychiatric and medical reference texts.[44] Indeed, every psychiatric reference text that has been established as authoritative in this case endorses sex reassignment surgery as a treatment for GID in appropriate circumstances.[45] No psychiatric reference text has been brought to the Court’s attention that fails to list, or rejects, the triadic therapy sequence or sex reassignment surgery as the accepted treatment regimen for GID.[46] Several courts have accepted the Benjamin standards as representing the consensus of the medical profession regarding the appropriate treatment for GID or transsexualism. See Gammett v. Idaho State Bd. of Corr., No. CV05-257-S-MHW (D. Idaho, July 27, 2007) (memorandum decision and order); Houston v. Trella, No. 2:04-CV-01393 (D.N.J., Sept. 25, 2006) (opinion); Kosilek v. Maloney, 221 F. Supp. 2d 156, 158 (D. Mass. 2002); Farmer v. Hawk-Sawyer, 69 F. Supp. 2d 120, 121 n.3 (D.D.C. 1999). Nonetheless, respondent’s expert Dr. Schmidt contends in his report that “physician acceptance of the * * * [Benjamin standards] is limited” and that the standards are guidelines and are only “accepted as more than guidelines by professionals who advocate for hormonal and surgical treatment of Gender Identity Disorder”. However, Dr. Schmidt conceded on cross-examination his prior sworn statement to the effect that he agreed with the Benjamin standards (except that psychotherapy should be mandatory rather than recommended) and was unaware of any significant disagreement with the Benjamin standards in the psychiatric field, other than those who believe that sex reassignment surgery is unethical,[47] a position that Dr. Schmidt characterized as a minority one. Dr. Schmidt also acknowledged that all GID patients at the sexual disorders clinic at Johns Hopkins where he practices are advised to become familiar with the Benjamin standards of care, and he concedes that cross-gender hormone therapy and sex reassignment surgery “have recognized medical and psychiatric benefits” for persons suffering from GID.[48] Dr. Schmidt also observed in his report that most physicians — indeed, most psychiatrists — know very little about GID or its treatment and shun GID patients, which may explain why the acceptance of the Benjamin standards is not broad based in American medicine. In any event, given his own acceptance of the standards and their use in his clinic, to the extent Dr. Schmidt is suggesting that the standards have limited acceptance among professionals knowledgeable regarding GID, he is unpersuasive. The widespread recognition of the Benjamin standards in the medical literature in evidence strongly supports the conclusion that the standards enjoy substantial acceptance. Moreover, petitioner’s expert Dr. Brown contends that in the case of severe GID, sex reassignment surgery is the only known effective treatment; indeed, Dr. Brown was unaware of any case where psychotherapy alone had been effective in treating severe GID. The U.S. Court of Appeals for the Seventh Circuit and the highest courts of two States have reached similar conclusions. See Maggert v. Hanks, 131 F.3d at 671; Sommers v. Iowa Civil Rights Commn., 337 N.W.2d 470, 473 (Iowa 1983); Doe v. Minn. Dept. of Pub. Welfare, 257 N.W.2d 816, 819 (Minn. 1977).[49] Respondent also argues that petitioner’s sex reassignment surgery did not “treat” disease within the meaning of section 213(d)(9)(B) because there is insufficient scientific evidence of the surgery’s efficacy in treating GID. Petitioner’s and respondent’s experts disagree regarding the sufficiency of the scientific proof of the surgery’s efficacy. Respondent’s expert Dr. Schmidt contends that efficacy (beyond patient satisfaction) has not been demonstrated, whereas petitioner’s expert Dr. Brown believes there is ample proof of positive therapeutic outcomes. Psychiatric reference texts support Dr. Brown’s position. See Green, “Gender Identity Disorder in Adults”, in New Oxford Textbook of Psychiatry 915 (Gelder, et al., eds., Oxford Univ. Press 2000) (stating “Follow-up reports on operated transsexuals are generally quite favorable” and describing a study where transsexual patients were randomly divided into two groups, one receiving surgery promptly and the other having surgery postponed for 2 years; “The group that received the earlier surgery showed significant improvement in a range of psychometric measures and maintained employment. The unoperated group showed no improvement in psychological testing and deteriorated in employment”); Green & Blanchard, “Gender Identity Disorders,” in Kaplan & Sadock’s Comprehensive Textbook of Psychiatry 1660 (Sadock & Sadock, eds., 7th ed., Lippincott Williams & Wilkins 2000) (“Outcome studies as a whole suggest that surgical sex reassignment produces additional improvements in psychosocial adjustment”); Levine, “Sexual Disorders”, in Psychiatry 1492 (Tasman, et al., eds., 2d ed., John Wiley & Sons 2005) (“Surgery can be expected to add further improvements in the lives of patients [citation omitted] — more social activities with friends and family, more activity in sports, more partner sexual activity, and improved vocational status”). However, even assuming some debate remains in the medical profession regarding acceptance of the Benjamin standards or the scientific proof of the therapeutic efficacy of sex reassignment surgery, a complete consensus on the advisability or efficacy of a procedure is not necessary for a deduction under section 213. See, e.g., Dickie v. Commissioner, T.C. Memo. 1999-138 (naturopathic cancer treatments deductible); Crain v. Commissioner, T.C. Memo. 1986-138 (holistic cancer treatments deductible but for failure of substantiation); Tso v. Commissioner, T.C. Memo. 1980-399 (Navajo “sings” (healing ceremonies) deductible); Rev. Rul. 72-593, 1972 — 2 C.B. 180 (acupuncture deductible); Rev. Rul. 55-261, 1955-1 C.B. 307 (services of Christian Science practitioners deductible). It is sufficient if the circumstances “justify a reasonable belief the * * * [treatment] would be efficacious”. Havey v. Commissioner, 12 T.C. at 412. That standard has been fully satisfied here. The evidence is clear that a substantial segment of the psychiatric profession has been persuaded of the advisability and efficacy of hormone therapy and sex reassignment surgery as treatment for GID, as have many courts. Finally, the Court does not doubt that, as respondent’s expert Dr. Schmidt points out in his report, some medical professionals shun transsexual patients and consider cross-gender hormone therapy and sex reassignment surgery unethical because they disrupt what is considered to be a “normally functioning hormonal status or destroy healthy, normal tissue.” However, the Internal Revenue Service has not heretofore sought to deny the deduction for a medical procedure because it was considered unethical by some. See, e.g., Rev. Rui. 73-201, 1973-1 C.B. 140 (cost of abortion legal under State law is deductible medical care under section 213); Rev. Rui. 55-261, supra (services of Christian Science practitioners deductible). Absent a showing of illegality, any such ground for denying a medical expense deduction finds no support in section 213. In sum, the evidence establishes that cross-gender hormone therapy and sex reassignment surgery are well-recognized and accepted treatments for severe GID. The evidence demonstrates that hormone therapy and sex reassignment surgery to alter appearance (and, to some degree, function[50]) are undertaken by GID sufferers in an effort to alleviate the distress and suffering occasioned by GID, and that the procedures have positive results in this regard in the opinion of many in the psychiatric profession, including petitioner’s and respondent’s experts. Thus, a “reasonable belief” in the procedures’ efficacy is justified. See Havey v. Commissioner, supra at 412. Alleviation of suffering falls within the regulatory and caselaw definitions of treatment, see Starrett v. Commissioner, supra; sec. 1.213 — 1(e)(1), Income Tax Regs., and to “relieve” is to “treat” according to standard dictionary definitions. We therefore conclude and hold that petitioner’s hormone therapy and sex reassignment surgery “[treated] * * * disease” within the meaning of section 213(d)(9)(B) and accordingly are not “cosmetic surgery” as defined in that section. While our holding that cross-gender hormone therapy and sex reassignment surgery are not cosmetic surgery is based upon the specific definition of that term in section 213(d)(9)(B), our conclusion that these procedures treat disease also finds support in the opinions of other courts that have concluded for various nontax purposes that sex reassignment surgery and/or hormone therapy are not cosmetic procedures. See, e.g., Meriwether v. Faulkner, 821 F.2d at 411-413 (rejecting, in an Eighth Amendment case, the District Court’s conclusion that a transsexual inmate’s requested hormone therapy was ‘“elective medication’ necessary only to maintain ‘a physical appearance and life style’” and noting that numerous courts have “expressly rejected the notion that transsexual surgery is properly characterized as cosmetic surgery, concluding instead that such surgery is medically necessary for the treatment of transsexualism”); Pinneke v. Preisser, 623 F.2d 546, 548 (8th Cir. 1980) (State Medicaid plan may not deny reimbursement for sex reassignment surgery on grounds that it is “cosmetic surgery”); Rush v. Parham, 440 F. Supp. 383, 390-391 (N.D. Ga. 1977) (to same effect), revd. on other grounds 625 F.2d 1150 (5th Cir. 1980); J.D. v. Lackner, 145 Cal. Rptr. 570, 572 (Ct. App. 1978) (sex reassignment surgery is not “cosmetic surgery” as defined in State Medicaid statute; “We do not believe, by the wildest stretch of the imagination, that such surgery can reasonably and logically be characterized as cosmetic.”); G.B. v. Lackner, 145 Cal. Rptr. 555, 559 (Ct. App. 1978) (to same effect); Davidson v. Aetna Life & Cas. Ins. Co., 420 N.Y.S.2d 450, 453 (N.Y. Sup. Ct. 1979) (sex reassignment surgery is not “cosmetic surgery” within meaning of medical insurance policy exclusion; sex reassignment surgery “is performed to correct a psychological defect, and not to improve muscle tone or physical appearance. * * * [It] cannot be considered to be of a strictly cosmetic nature.”). But see Smith v. Rasmussen, 249 F.3d 755, 759-761 (8th Cir. 2001) (denial of reimbursement for sex reassignment surgery proper where State Medicaid plan designated sex reassignment surgery as “cosmetic surgery’ and alternate GID treatments available). 2. Breast Augmentation Surgery We consider separately the qualification of petitioner’s breast augmentation surgery as deductible medical care, because respondent makes the additional argument that this surgery was not necessary to the treatment of GID in petitioner’s case because petitioner already had normal breasts before her surgery. Because petitioner had normal breasts before her surgery, respondent argues, her breast augmentation surgery was “directed at improving * * * [her] appearance and [did] not meaningfully promote the proper function of the body or prevent or treat illness or disease”, placing the surgery squarely within the section 213(d)(9)(B) definition of “cosmetic surgery”. Petitioner has not argued, or adduced evidence, that the breast augmentation surgery ameliorated a deformity within the meaning of section 213(d)(9)(A). Accordingly, if the breast augmentation surgery meets the definition of “cosmetic surgery” in section 213(d)(9)(B), it is not “medical care” that is deductible pursuant to section 213(a). For the reasons discussed below, we find that petitioner has failed to show that her breast augmentation surgery “[treated]” GID. The Benjamin standards provide that breast augmentation surgery for a male-to-female patient “may be performed if the physician prescribing hormones and the surgeon have documented that breast enlargement after undergoing hormone treatment for 18 months is not sufficient for comfort in the social gender role.” The record contains no documentation from the endocrinologist prescribing petitioner’s hormones at the time of her surgery. To the extent Ms. Ellaborn’s or Dr. Coleman’s recommendation letters to Dr. Meltzer might be considered substitute documentation for that of the hormone-prescribing physician, Ms. Ellaborn’s two letters are silent concerning the condition of petitioner’s presurgical breasts, while Dr. Coleman’s letter states that petitioner “appears to have significant breast development secondary to hormone therapy”. The surgeon here, Dr. Meltzer, recorded in his presurgical notes that petitioner had “approximately B cup breasts with a very nice shape.” [51] Thus, all of the contemporaneous documentation of the condition of petitioner’s breasts before the surgery suggests that they were within a normal range of appearance, and there is no documentation concerning petitioner’s comfort level with her breasts “in the social gender role”. Dr. Meltzer testified with respect to his notes that his reference to the “very nice shape” of petitioner’s breasts was in comparison to the breasts of other transsexual males on feminizing hormones and that petitioner’s breasts exhibited characteristics of gynecomastia, a condition where breast mass is concentrated closer to the nipple as compared to the breasts of a genetic female. Nonetheless, given the contemporaneous documentation of the breasts’ apparent normalcy and the failure to adhere to the Benjamin standards’ requirement to document breast-engendered anxiety to justify the surgery, we find that petitioner’s breast augmentation surgery did not fall within the treatment protocols of the Benjamin standards and therefore did not “treat” GID within the meaning of section 213(d)(9)(B). Instead, the surgery merely improved her appearance. The breast augmentation surgery is therefore “cosmetic surgery” under the section 213(d)(9)(B) definition unless it “meaningfully [promoted] the proper function of the body”. The parties have stipulated that petitioner’s breast augmentation “did not promote the proper function of her breasts”. Although petitioner expressly declined to stipulate that the breast augmentation “did not meaningfully promote the proper functioning of her body within the meaning of I.R.C. § 213”, we conclude that the stipulation to which she did agree precludes a finding on this record, given the failure to adhere to the Benjamin standards, that the breast augmentation surgery “meaningfully [promoted] the proper function of the body” within the meaning of section 213(d)(9)(B). Consequently, the breast augmentation surgery is “cosmetic surgery” that is excluded from deductible “medical care”.[52] E. Medical Necessity Finally, respondent argues that petitioner’s sex reassignment surgery was not “medically necessary”,[53] which respondent contends is a requirement intended by Congress to apply to procedures directed at improving appearance, as evidenced by certain references to “medically necessary” procedures in the legislative history of the enactment of the cosmetic surgery exclusion of section 213(d)(9).[54] Respondent in effect argues that the legislative history’s contrast of nondeductible cosmetic surgery with “medically necessary” procedures evidences an intent by Congress to impose a requirement in section 213(d)(9) of medical necessity for the deduction of procedures affecting appearance. We find it unnecessary to resolve respondent’s claim that section 213(d)(9) should be interpreted to require a showing of “medical necessity” notwithstanding the absence of that phrase in the statute. That is so because respondent’s contention would not bar the deductions at issue, inasmuch as we are persuaded, as discussed below, that petitioner has shown that her sex reassignment surgery was medically necessary. Respondent’s basis for the claim that petitioner’s sex reassignment surgery was not medically necessary is the expert report and testimony of his expert, Dr. Schmidt. Dr. Schmidt acknowledges in his report that the definition of medical necessity “varies according to the defining party”. Dr. Schmidt never expressly defines the term, but he concludes that sex reassignment surgery is not medically necessary because (1) no “community” standard of care requires it (so that a practitioner’s failure to provide the surgery would not constitute malpractice) and (2) in his view a therapist should remain neutral regarding the decision to have the surgery — which makes the surgery, Dr. Schmidt reasons, elective.[55] Taken together, these two factors indicate that the surgery is not medically necessary, in Dr. Schmidt’s view. Respondent has not shown that Dr. Schmidt’s concept of medical necessity is widely accepted, and it strikes the Court as idiosyncratic and unduly restrictive. Moreover, Dr. Schmidt also expressed the view that sex reassignment surgery has “recognized medical and psychiatric benefits” and is “certainly medically helpful”. Dr. Schmidt conceded in his report that a significant segment of those physicians who are knowledgeable concerning GID believes that sex reassignment surgery is medically necessary, ranging from those who believe such surgery is generally medically necessary in treating GID to those who think it is medically necessary in selected cases. As noted, petitioner’s expert Dr. Brown believes that sex reassignment surgery is often the only effective treatment for severe GID, and a number of courts have concurred. Dr. Brown therefore believes the surgery is medically necessary for severe GID. See also Sadock & Sadock, supra (“When the patient’s gender dysphoria is severe and intractable, sex reassignment may be the best solution.”) Several courts have also concluded in a variety of contexts that sex reassignment surgery for severe GID or transsexualism is medically necessary. See Meriwether v. Faulkner, 821 F.2d at 412; Pinneke v. Preisser, 623 F.2d at 548; Sommers v. Iowa Civil Rights Commn., 337 N.W.2d at 473; Doe v. Minn. Dept. of Pub. Welfare, 257 N.W.2d at 819; Davidson v. Aetna Life & Cas. Ins. Co., 420 N.Y.S.2d at 453. The mental health professional who treated petitioner concluded that petitioner’s GID was severe, that sex reassignment surgery was medically necessary, and that petitioner’s prognosis without it was poor. Given Dr. Brown’s expert testimony,[56] the judgment of the professional treating petitioner, the agreement of all three experts that untreated GID can result in self-mutilation and suicide, and, as conceded by Dr. Schmidt, the views of a significant segment of knowledgeable professionals that sex reassignment surgery is medically necessary for severe GID, the Court is persuaded that petitioner’s sex reassignment surgery was medically necessary. IV. Conclusion The evidence amply supports the conclusions that petitioner suffered from severe GID, that GID is a well-recognized and serious mental disorder, and that hormone therapy and sex reassignment surgery are considered appropriate and effective treatments for GID by psychiatrists and other mental health professionals who are knowledgeable concerning the condition. Given our holdings that GID is a “disease” and that petitioner’s hormone therapy and sex reassignment surgery “[treated]” it, petitioner has shown the “existence * * * of a disease” and a payment for goods or services “directly or proximately related” to its treatment. See Jacobs v. Commissioner, 62 T.C. at 818. She likewise satisfies the “but for” test of Jacobs, which requires a showing that the procedures were an essential element of the treatment and that they would not have otherwise been undertaken for nonmedical reasons. Petitioner’s hormone therapy and sex reassignment surgery were essential elements of a widely accepted treatment protocol for severe GID. The expert testimony also establishes that given (1) the risks, pain, and extensive rehabilitation associated with sex reassignment surgery, (2) the stigma encountered by persons who change their gender role and appearance in society, and (3) the expert-backed but commonsense point that the desire of a genetic male to have his genitals removed requires an explanation beyond mere dissatisfaction with appearance (such as GID or psychosis), petitioner would not have undergone hormone therapy and sex reassignment surgery except in an effort to alleviate the distress and suffering attendant to GID. Respondent’s contention that petitioner undertook the surgery and hormone treatments to improve appearance is at best a superficial characterization of the circumstances that is thoroughly rebutted by the medical evidence. Petitioner has shown that her hormone therapy and sex reassignment surgery treated disease within the meaning of section 213 and were therefore not cosmetic surgery. Thus petitioner’s expenditures for these procedures were for “medical care” as defined in section 213(d)(1)(A), for which a deduction is allowed under section 213(a). To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Reviewed by the Court. Colvin, Cohen, Thornton, Marvel, Wherry, Paris, and Morrison, JJ., agree with this majority opinion. Petitioner concedes that she is not entitled to any deduction for an individual retirement account contribution, and respondent concedes that petitioner is entitled to deduct $1,369.59 as medical expenses under sec. 213. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Reflecting petitioner’s preference, we use the feminine pronoun to refer to her throughout this Opinion. Petitioner and her spouse were divorced in 1996. In reaching her diagnosis Ms. Ellaborn considered and ruled out other causes — so-called co-morbid conditions — of petitioner’s symptoms, including psychosis, an earlier diagnosis of attention deficit/hyperactivity disorder, depression, and transvestic fetishism. Transvestic fetishism “occurs in heterosexual (or bisexual) men for whom the cross-dressing behavior is for the purpose of sexual excitement. Aside from cross-dressing, most individuals with Transvestic Fetishism do not have a history of childhood cross-gender behaviors.” DSM-IV-TR at 580. Petitioner reported to Ms. Ellaborn that she cross-dressed in order to feel more feminine rather than for purposes of sexual arousal. A modifier of “severe” indicates that there are many more symptoms than those required to make the diagnosis, or several symptoms that are particularly severe are present, or the symptoms result in marked impairment in social and occupational functioning beyond the minimum threshold required for diagnosis. See DSM-IV-TR at 2. The GID diagnosis was labeled “transsexualism” when it first appeared in the third edition of the DSM published in 1980 (DSM-III). The fourth edition of the DSM, published in 1994 (DSM — IV), replaced the transsexualism diagnosis with GID and added the criterion for the diagnosis that the patient exhibit clinically significant distress or impairment in important areas of functioning. The DSM-IV underwent a text revision in 2000, resulting in the DSM-IV-TR, but there are no material differences in the DSM’s treatment of GID as between the DSM — IV and DSM-IV-TR editions. Notwithstanding the replacement of the transsexualism diagnosis with GID, the terms “transsexualism” and “transsexual” are still used generally in psychiatry to refer to severe or profound GID— or a sufferer thereof. Harry Benjamin, M.D. (1885-1986), was an endocrinologist who in conjunction with mental health professionals in New York did pioneering work in the study of transsexualism. The parties have stipulated that the term “gender dysphoria” was coined by Dr. Norman Fisk (Dr. Fisk) in 1973 to describe patients presenting with dissatisfaction and unhappiness with their anatomic and genetic sex and their assigned gender. The parties have further stipulated that, according to a 1974 article by Dr. Fisk, transsexualism represents the most extreme form of gender dysphoria. Both parties’ experts agree that administration of cross-gender hormones in genetic males with GID also has a psychological effect, producing a sense of well-being and a “calming effect”. To be qualified to recommend hormonal or surgical sex reassignment, a psychotherapist must have (1) a master’s degree in clinical behavioral science, and at least one of the recommenders for surgical sex reassignment must have a doctoral degree in the field; (2) competence in psychotherapy as demonstrated by a State license to practice it; and (3) specialized competence in sex therapy and gender identity disorders as demonstrated by supervised clinical experience and continuing education. Petitioner attended monthly individual therapy sessions throughout most of 1997. Petitioner was hesitant about starting hormones and changing her appearance too quickly. She was concerned about the impact on her children and coworkers. Petitioner’s 16-year-old son was living with her at the time, and petitioner wished to postpone significant changes in her appearance until after her son had graduated from high school and begun college. Petitioner also commenced electrolysis treatments to remove body hair in September 1997 and continued them through 2005. The deductibility of the expenses related to electrolysis is not at issue. The children’s reactions were characterized by embarrassment, anger, denial, and withdrawal. Petitioner also carried with her a letter from Ms. Ellaborn explaining the GID diagnosis, to be used in the event she was confronted by authorities for using a sex-segregated facility such as a restroom or a changing room. Ms. Ellaborn had observed that, notwithstanding 18 months of hormone therapy, petitioner had distinctly male facial features which interfered with her “passing” as female. Ms. Ellaborn referred petitioner to a plastic surgeon who in March 2000 performed procedures designed to feminize petitioner’s facial features, including a rhinoplasty (nose reshaping), a facelift, and a tracheal shave (reducing cartilage of the “Adam’s apple”). Petitioner was dissatisfied with the initial results, and in December 2000 the surgeon performed further surgery to revise the effects of the earlier procedures. The surgeon also gave petitioner a Botox treatment at that time. The deductibility of the foregoing procedures is not at issue. In one instance, petitioner held a knife and had an urge to cut off her penis. The deductibility of these procedures undertaken in 2002 and 2005 is not at issue. See Green, “Gender Identity Disorder in Adults”, in New Oxford Textbook of Psychiatry 915 (Gelder, et al., eds., Oxford Univ. Press 2000); Green & Blanchard, “Gender Identity Disorders”, in Kaplan & Sadock’s Comprehensive Textbook of Psychiatry 1660 (Sadock & Sadock, eds., 7th ed., Lippincott Williams & Wilkins 2000); Levine, “Sexual Disorders”, in Psychiatry 1492 (Tasman, et al., eds., 2d ed., John Wiley & Sons 2005). Dr. Schmidt’s report states that he is uncertain that GID is a mental disorder in the light of the heterogeneity of GID patients (in terms of presentation, personality, and motivation) and the lack of a scientifically supported etiology of the condition. Dr. Dietz believes that “illness” is simply “the recognized presence of disease, usually as a result of the host experiencing signs or symptoms, but sometimes as a result of an incidental finding by a clinician or the observations of a third party.” As confirmed by Dr. Dietz, bulimia is a mental disorder characterized by binge eating followed by inappropriate compensatory behaviors to avoid weight gain, such as induced vomiting. As confirmed by Dr. Dietz, anorexia is a mental disorder in which an individual refuses to maintain a minimally normal body weight, is phobic regarding weight gain, and exhibits a disturbance in perception of the shape or size of his or her body. Sec. 213(b) provides that amounts paid for a prescribed drug are treated as amounts paid for medical care. The parties have stipulated that the feminizing hormones petitioner purchased in 2001 were a prescribed drug within the meaning of sec. 213(b) and (d)(3), but respondent does not stipulate that the hormones were for the treatment of an illness or disease within the meaning of sec. 213. The parties have stipulated that if any part of petitioner’s sex reassignment surgery is determined by the Court to be deductible under sec. 213, then petitioner’s travel and lodging costs incurred in connection with her consultation and surgery by Dr. Meltzer are also deductible. Applying the foregoing principles, the Court in Jacobs v. Commissioner, 62 T.C. 813 (1974), concluded that the expenses of the taxpayer’s divorce, even though the divorce was recommended by the taxpayer’s psychiatrist and was beneficial to the taxpayer’s mental health, were not deductible medical expenses because the divorce would have been undertaken even absent the taxpayer’s depression. The bill as initially passed in the House of Representatives did not include a provision addressing cosmetic surgery; this provision originated in the Senate. The report of the Senate Finance Committee, which was informally printed in the Congressional Record, contrasted “cosmetic” procedures with “medically necessary procedures” as follows: For purposes of the medical expense deduction, the IRS generally does not distinguish between procedures which are medically necessary and those which are purely cosmetic. * * * * 5{" * SÜ * * * Expenses for purely cosmetic procedures that are not medically necessary are, in essence, voluntary personal expenses, which like other personal expenditures (e.g., food and clothing) generally should not be deductible in computing taxable income. H* -J- -5* * * * [U]nder the provision, procedures such as hair removal electrolysis, hair transplants, lyposuction [sic], and facelift operations generally are not deductible. In contrast, expenses for procedures that are medically necessary to promote the proper function of the body and only incidentally affect the patient’s appearance or expenses for the treatment of a disfiguring condition arising from a congenital abnormality, personal injury or trauma, or disease (such as reconstructive surgery following removal of a malignancy) continue to be deductible * * *. Al-Murshidi v. Commissioner, T.C. Summary Opinion 2001-185, construed sec. 213(d)(9) but was decided under sec. 7463 and may not be treated as precedent. See sec. 7463(b). Respondent contends that petitioner’s hormone therapy was a “similar procedure” within the meaning of sec. 213(d)(9)(A). Petitioner also argues that the expenditures for the procedures at issue are deductible because they affected a structure or function of the body (within the meaning of sec. 213(d)(1)(A)) and were not “cosmetic surgery” under sec. 213(d)(9) because they were not “directed at improving the patient’s appearance” and because they “meaningfully [promoted] the proper function of the body” (within the meaning of sec. 213(d)(9)(B)). Given our conclusion, discussed hereinafter, that the expenditures for petitioner’s hormone therapy and sex reassignment surgery are deductible because they “[treated] * * * disease” within the meaning of sec. 213(d)(1)(A) and (9)(B), we need not resolve the foregoing issues with respect to those expenditures. We consider petitioner’s arguments with respect to the breast augmentation surgery more fully infra. As noted, respondent contends that petitioner’s hormone therapy is a “similar procedure” within the meaning of the sec. 213(d)(9)(A) exclusion from “medical care” of "cosmetic surgery or other similar procedures”. Respondent does not contend, however, that the hormone therapy’s status as a “similar procedure” within the meaning of sec. 213(d)(9)(A) ipso facto causes the therapy to be excluded from “medical care”. Instead, by arguing that the hormone therapy was directed at improving petitioner’s appearance and did not treat an illness or disease, respondent concedes that a “similar procedure” as used in sec. 213(d)(9)(A) is delimited by the definition of “cosmetic surgery” in sec. 213(d)(9)(B) — that is, that a “similar procedure” is excluded from the definition of “medical care” if it “is directed at improving the patient’s appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease”. The parties have stipulated that petitioner did not undertake hormone therapy or sex reassignment surgery to ameliorate a deformity arising from, or directly related to, a personal injury arising from an accident or trauma, or a disfiguring disease. Petitioner has neither argued nor adduced evidence that the foregoing procedures ameliorated a deformity arising from, or directly related to, a congenital abnormality. See sec. 213(d)(9)(A). We consider petitioner’s arguments concerning the breast augmentation surgery more fully infra. The experts all agree and the Court accepts, for purposes of deciding this case, that no organic or biological cause of GID has been demonstrated. In contrast, the testimony of the other two experts presents specialized medical knowledge concerning the nature of GID. These facts bear upon whether GID should be considered to qualify as a “disease”, as the Court interprets that term. Dr. Dietz’ testimony as a forensic psychiatrist is proper and useful regarding other matters, such as the state of knowledge concerning organic origins of mental conditions, and the Court relies on the testimony for certain other purposes, as discussed infra. The DLD program refers to the department of language development program, a special program at the taxpayer’s children’s school for children with learning disabilities. Fay v. Commissioner, 76 T.C. 408, 410 (1981). We recognize that the DSM-IV-TR cautions that inclusion of a diagnostic category therein “does not imply that the condition meets legal or other non-medical criteria for what constitutes mental disease, mental disorder, or mental disability.” For purposes of our decision in this case, GID’s inclusion in the DSM-IV-TR (and its predecessors) evidences widespread recognition of the condition in the psychiatric profession. Indisputably, the issue of whether GID is a “disease” for purposes of sec. 213 is for this Court to decide, and we do so on the basis of a range of factors, including GID’s inclusion in the DSM-IV-TR. See, e.g., American Medical Association, Complete Medical Encyclopedia 595, 1234 (Random House 2003); The Dictionary of Medical Terms 157 (4th ed. 2004); Dorland’s Illustrated Medical Dictionary, http://www.mercksource.com/pp/us/cns_hi dorlands: “Gender Identity Disorder and Transsexualism”, Merck Manuals Online Medical Library, http://www.merck.com./mmpe/ print/seel5/ch203/ch203b.html; Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health 728, 1808 (2003); National Institutes of Health, U.S. National Library of Medicine, MedlinePlus Medical Encyclopedia, http://nlm.nih.gov/medlineplus/ency/article/ 001527.html; Sloane-Dorland Annotated Medical-Legal Dictionary 202-203, 233, 291, 310, 744 (1987). Transsexualism is also listed and described in the International Classification of Diseases, Ninth Revision, Clinical Modification (6th ed.) a publication of the American Medical Association used in the United States for assigning codes to various diagnoses and procedures. Similarly, various gender identity disorders, including transsexualism, are listed and described in the International Classification of Diseases, Tenth Revision, a 1992 publication of the World Health Organization that classifies diseases and health related problems. Respondent stresses on brief that he stipulated that the foregoing publications were medical reference texts but did not stipulate the truth of their contents. Except where otherwise indicated, we consider medical reference texts solely for the fact that they recognize GID or transsexualism and treatments for the condition. Dr. Schmidt attributed his misgivings in part to the “lack of a scientifically supported etiology of the condition”, but as petitioner’s expert Dr. Brown pointed out, the same could be said of most mental disorders listed in the DSM. The U.S. Supreme Court has also treated transsexualism as a serious medical condition, relying on its listing in the DSM-III and the American Medical Association’s Encyclopedia of Medicine (1989). See Farmer v. Brennan, 511 U.S. 825, 829 (1994). Two Courts of Appeals have considered, but found it unnecessary to decide, whether GID or transsexualism constitutes a serious medical need for purposes of the Eighth Amendment. See Praylor v. Tex. Dept. of Criminal Justice, 430 F.3d 1208 (5th Cir. 2005), withdrawing 423 F.3d 524 (5th Cir. 2005) (holding that transsexualism constitutes a serious medical need for Eighth Amendment purposes); Farmer v. Moritsugu, 163 F.3d 610, 614-615 (D.C. Cir. 1998). But see Maggert v. Hanks, 131 F.3d 670 (7th Cir.1997), where the Court of Appeals for the Seventh Circuit, after concluding that the plaintiff inmate had failed to establish that he had gender dysphoria, observed in dicta that since treatment for gender dysphoria is “protracted and expensive” and the Eighth Amendment does not require that a prisoner be given medical care “that is as good as he would receive if he were a free person”, the Amendment “does not entitle a prison inmate to curative treatment for his gender dysphoria.” Id. at 671-672. Petitioner’s response to the administration of cross-gender hormones is especially persuasive regarding the diagnosis. Ms. Ellaborn observed that petitioner’s reaction to the effects of the hormones was essentially positive; that is, the hormones engendered a sense of well-being and a calming effect in petitioner — a well-documented phenomenon in genetic males suffering from GID who receive feminizing hormones, confirmed by both respondent’s and petitioner’s experts. By contrast, as Dr. Brown observed, when feminizing hormones are administered to non-GID-suffering males (for other medical reasons), and those males experience impotence, widening hips, and breast development, their response is not a sense of well-being but anxiety. See “Gender Identity”, Merck Manuals Second Home Edition, http://www.merck.com/mmhe/ print/sec07/chl04/chl04b.html; “Gender Identity Disorder and Transsexualism”, Merck Manuals Online Medical Library, supra; National Institutes of Health, U.S. National Library of Medicine, Medline Plus Medical Encyclopedia, supra; Senagore & Frey, “Orchiectomy”, Gale Encyclopedia of Surgery (Thomson Gale 2003). The following psychiatric reference texts have been established as learned treatises, see Fed. R. Evid. 803(18), and endorse the essential elements of the triadic therapy sequence of the Benjamin standards, including sex reassignment surgery. American Psychiatric Association, Treatments of Psychiatric Disorders, ch. 70 (3d ed., American Psychiatric Press 2001): The [Benjamin] “Standards of Care” for treating gender-dysphoric individuals, developed by an international group of experts [citation omitted] and followed by most responsible professionals in the field, provides a valuable guide for evaluation and treatment. * * * * =i * * Once a patient has met readiness criteria for referral as outlined in the [Benjamin] Standards of Care, she must decide on a surgical technique and surgeon. * * * Becker, et al., ch. 19, “Sexual and Gender Identity Disorders”, in The American Psychiatric Press Textbook of Psychiatry (3d ed.): Sex reassignment is a long process that must be carefully monitored. * * * If the patient is considered appropriate for sex reassignment, psychotherapy should be started to prepare the patient for the cross-gender role. The patient should then go out into the world and live in the cross-gender role before surgical reassignment. * * * After 1-2 years, if these measures have been successful and the patient still wishes reassignment, hormone treatment is begun. * * * After 1-2 years of hormone therapy, the patient may be considered for surgical reassignment if such a procedure is still desired. Green, in New Oxford Textbook of Psychiatry, supra at 914—915: * * * The [Benjamin standards of care] programme includes, in addition to ongoing psychiatric or psychological monitoring, possibly endocrine therapy and, depending on the outcome of the graduated trial period of cross-gender living, possibly sex reassignment surgical procedures. The philosophy of treatment is to do reversible procedures before those that are irreversible. * * * If patients can demonstrate to themselves and mental health experts that they have successfully negotiated the ‘Real Life Test’ and are adjusting better socially in this new gender role, they can be referred for surgery. Sadock & Sadock, Kaplan & Sadock’s Comprehensive Textbook of Psychiatry 1659-1660 (7th ed., Lippincott Williams & Wilkins 2000): * * * When the patient’s gender dysphoria is severe and intractable, sex reassignment may be the best solution. The first medical intervention in this process is hormone therapy. * * * * * * The second major stage in the medical treatment of transsexualism is sex reassignment surgery. All major gender identity clinics in North America and western Europe require their patients to live full-time in the cross-gender role for some time — usually 1 to 2 years — prior to surgery. Tasman et ah, Psychiatry 1491-1492 (2d ed., John Wiley & Sons 2003): The treatment of * * * [gender identity disorders], although not as well-based on scientific evidence as some psychiatric disorders, has been carefully scrutinized by multidisciplinary committees of specialists with the Harry Benjamin International Gender Dysphoria Association [WPATH] for over 20 years. For more details in managing an individual patient, please consult its “Standards of Care” [citation omitted]. * '* * ‡ ‡ 4: $ Living in the aspired-to-gender role — working, relating, conducting the activities of daily living— is a vital process that enables one of three decisions: to abandon the quest, to simply live in this new role, or to proceed with breast or genital surgery [citation omitted]. * * * Ideally, hormones should be administered by endocrinologists who have a working relationship with a mental health team dealing with gender problems. * * * * * :!. 4: 4- * * Surgical intervention is the final external step. Respondent offered into evidence a chapter from a psychiatric reference text that respondent claimed did not reference the Benjamin standards of care; namely, Becker, et al., supra. However, a review of the chapter cited (particularly pp. 743-744) reveals that the Benjamin triadic sequence — cross-gender hormone therapy, living in the cross-gender role, and sex reassignment surgery — is discussed (without naming the Benjamin standards or WPATH specifically) and endorsed as the appropriate treatment protocol, as set out supra note 45. Dr. Schmidt cited an article by Dr. Paul McHugh as evidence of the view of sex reassignment surgery as unethical and not medically necessary. On cross-examination, Dr. Schmidt acknowledged that the McHugh article was not published in a peer-reviewed medical journal hut instead in a religious publication. See McHugh, “Surgical Sex”, First Things, The Institute on Religion and Public Life (November 2004), http://www.firstthings.com/index.php (online edition). Respondent likewise cites the McHugh article on brief as medical opinion, without disclosing the source of its publication. Dr. Schmidt also acknowledged previously stating that a surgically created vagina in a biological male with GID “creates an internal sense of consistency that is very important in maintaining a balance on a day-to-day basis and not having to bounce back and forth between, you know, am I male or am I female.” Judge Posner wrote in Maggert v. Hanks, 131 F.3d at 671: The cure for the male transsexual consists not of psychiatric treatment designed to make the patient content with his biological sexual identity — that doesn’t work — but of estrogen therapy designed to create the secondary sexual characteristics of a woman followed by the surgical removal of the genitals and the construction of a vagina-substitute out of penile tissue. [Citations omitted.] See also Tasman et al., Psychiatry 1491 (2d ed., John Wiley & Sons 2003): No one knows how to cure [through psychotherapy] an adult’s gender problem. People who have long lived with profound cross-gender identifications do not get insight — either behaviorally modified or medicated — and find that they subsequently have a conventional gender identity. Psychotherapy is useful, nonetheless [citation omitted]. * * * The undisputed evidence is that administration of feminizing hormones to genetic male GID sufferers produces a psychological calming effect in addition to physical changes. Sex reassignment surgery in genetic males uses penile tissue in the newly created vagina in a manner designed to make the patient capable of arousal and intercourse. Even petitioner conceded in her testimony that she had “a fair amount of breast development * * * from the hormones” at the time of her presurgical consultation with Dr. Meltzer. Respondent also argues that the various surgical procedures petitioner underwent to feminize her facial features in 2000 and 2005 demonstrate a propensity for cosmetic surgery that is relevant in assessing whether petitioner’s hormone therapy and sex reassignment surgery were undertaken for the purpose of improving petitioner’s appearance rather than treating a disease. We disagree. The deductibility of petitioner’s facial surgery, undertaken in years other than the year in issue, is not at issue in this case. However, there is substantial evidence that such surgery may have served the same therapeutic purposes as (genital) sex reassignment surgery and hormone therapy; namely, effecting a female appearance in a genetic male. Both Ms. Ellaborn and Dr. Meltzer testified that petitioner had masculine facial features which interfered with her passing as female. The expert testimony confirmed that passing as female is important to the mental health of a male GID sufferer, and the Benjamin standards contemplate surgery to feminize facial features as part of sex reassignment for a male GID sufferer. Thus, we conclude that the facial surgery does not suggest, as respondent contends, that petitioner had a propensity for conventional cosmetic surgery. Respondent does not make this argument with respect to petitioner’s hormone therapy. His own expert, Dr. Schmidt, effectively concedes the medical necessity of hormone therapy when he argues that sex reassignment surgery is not medically necessary because hormone therapy is one of the “alternative, successful methods of managing Gender Identity Disorder short of surgery.” Respondent relies upon the following excerpts from the report of the Senate Finance Committee issued in connection with the enactment of the cosmetic surgery exclusion of sec. 213(d)(9): Expenses for purely cosmetic procedures that are not medically necessary are, in essence, voluntary personal expenses, which like other personal expenditures (e.g., food and clothing) generally should not be deductible in computing taxable income. # * * 5}s * * * * [Ejxpenses for procedures that are medically necessary to promote the proper function of the body and only incidentally affect the patient’s appearance * * * continue to be deductible * * *. [136 Cong. Rec. 30485, 30570 (1990).] The Senate Finance Committee report is set out more fully supra note 27. We note that the discussion of sec. 213(d)(9) in the conference report issued with respect to the agreed final version of sec. 213(d)(9) contains no reference to “medical necessity” or any variant of the phrase. See H. Conf. Rept. 101-964, at 1031 (1990), 1991-2 C.B. 560, 562. Petitioner’s expert Dr. Brown disagrees with the view that a therapist should remain neutral regarding the decision to undergo sex reassignment surgery, believing that a patient experiencing the distress of GID is not well equipped to make a decision on irreversible surgery. In Dr. Brown’s opinion, the therapist should counsel patients towards less invasive treatments until they have proven ineffective and the surgery appears to be the only effective alternative left. When weighing Dr. Brown’s and Dr. Schmidt’s opposing views on whether sex reassignment surgery is medically necessary, we consider that Dr. Brown is widely published in peer-reviewed medical journals and academic texts on the subject of GID, whereas Dr. Schmidt is not. Accordingly, there is a reasonable basis to conclude that Dr. Brown’s views are more widely recognized and accepted in the psychiatric profession.